# GILBERT

*v.*

# THE WASHINGTON BENEFICIAL ENDOWMENT ASSOCIATION.

## STEWART

*v.*

## SAME.

APPELLATE PRACTICE; RECORD ON APPEAL; INSOLVENT ESTATES, DISTRIBUTION OF; ACCOUNTING; PRIORITIES; PREFERENCES; EXCEPTIONS TO AUDITORS' REPORT, WITHDRAWAL OF.

1. Where there was a fund in court for distribution resulting from the sale of the assets of an insolvent insurance company, it was *held* that inperfections in the pleadings in several consolidated causes, could not be permitted to stand in the way of a proper distribution, especially where the company and another concerned in the proceedings were defunct for all purposes other than the consummation of the litigation.

2. While on an appeal from a decree overruling exceptions to and confirming a report of the auditor distributing the assets of an insolvent insurance company, a schedule attached to the report is properly omitted when of a voluminous character and containing merely the names of about a thousand distributees with the small and unimportant sums allowed each of them, and where there are no exceptions based upon such individual allowances; the sum and substance and tenor and purport of the schedule might well have been agreed upon between the parties and given a brief paragraph in the record.

3. Where after a sale by an insurance company of its entire property to another company had been held void by this court as against

the creditors and certificate-holders of the former company for
fraud and want of consideration and an alternative claim by the
latter company for reimbursement of the purchase price denied
until the claims of the creditors and certificate-holders should be
satisfied, it was *held* that the auditor in thereafter providing for
a distribution of a fund realized from a sale of the assets of the
vendor company, which was sufficient only to pay a small divi-
dend to the certificate-holders, properly excluded the claim of the
vendee company for reimbursement.

4. While courts of equity usually seek to put all the creditors of an
insolvent estate upon the same footing as to payment of their
claims, and in general allow no preferences between them, jus-
tice often requires preferences; the equality to be sought being
generally equality between members of a class rather than between
different classes of individuals.

5. In the distribution of the assets of an insolvent insurance company,
whether it be a joint stock, mutual or endowment company, the
claims of (1) ordinary creditors; (2) policy or certificate-holders,
and (3) stockholders should be preferred in the order enumerated.

6. In the settlement of the affairs of an insolvent endowment company
which did a life insurance business by way of assessments levied
from time to time as deaths occurred, a claim on a certificate
which matured by the death of the member several years before
proceedings were commenced in which it was declared insolvent,
is entitled to priority over the claims of certificate-holders and
stockholders, especially where the claim was reduced to judgment.

7. The liability of certificate-holders in such an endowment company
to pay assessments terminates upon its insolvency and the com-
mencement of proceedings to wind up its affairs, and, as creditors,
they become entitled to an accounting as to the present value of
their contracts on the basis of the surrender value of their
certificates.

8. Where a party to one of several consolidated causes withdraws his
exceptions to a portion of a report of the auditor based on the
allowance of counsel fees and other costs, a party to another of
the causes who had taken no such exceptions, cannot be heard
to object to such withdrawal, on an appeal from a decree con-
firming the auditor's report.

Nos. 1132 and 1133. Submitted February 5, 1903. Decided March 3, 1903.

HEARING on an appeal by exceptants from a decree of the
Supreme Court of the District of Columbia overruling ex-
ceptions to and confirming a report of the auditor in several
consolidated equity causes.                    *Reversed.*

STATEMENT OF FACTS.

For purposes of convenience, the following statement of facts relating to the claim of the appellant Mrs. Henry Anne Stuart, whose claim to priority over the other distributees was denied by the auditor, and who appealed from the order of the lower court, confirming the report, is here made. It is made up largely from the brief filed on her behalf and from the auditor's report:

Charles Stuart, a certificate-holder of the endowment association and husband of his beneficiary, the appellant Mrs. Henry Anne Stuart, died on July 21, 1886, and after due proof of his death and due demand, the association having refused payment of the amount called for by his certificate, namely, $5,000, suit therefor was brought, which finally resulted, on June 21, 1894, in a verdict against the association for $5,000 and interest from September 29, 1887 (the date of bringing suit), besides costs. A motion for a new trial having been interposed, entry of judgment on the verdict was delayed until October 1, 1894, when judgment was entered. An appeal to this court was taken by the association, but was not perfected, and was duly dismissed on November 9, 1894, when a writ of *fieri facias* on the judgment was issued and the following day was returned *nulla bona.*

In the meanwhile, between the date of the verdict and that of the judgment, namely, on August 9, 1894, a deed purporting to be that of the association and to convey its only holding of real estate to the Commercial Alliance Life Insurance Company, was executed by " Lawrence Gardner, president W. B. E. A.," and by him acknowledged as the pretended attorney-in-fact of the association, created as such by the instrument itself; and this instrument was, on the following day, recorded among the land records of the District of Columbia.

Thereupon, and on August 30, 1894, Ball and two others, claiming, not as stockholders, but as certificate-holders, of the endowment association, filed their bill in equity against the association, Gardner and the insurance company, with a view to having the assets of the association taken charge of,

its business wound up "in due course of administration," and the *equitable value of their claims upon the association* ascertained and paid out of the assets of the association *then* existing and in the hands of any of the defendants; and to that end the bill prayed for (1) an accounting, (2) an injunction against the intermeddling *pendente lite* by the defendants with the business of the association, and (3) general relief. The bill did not seek a vacation of the above-mentioned deed or a cancellation of the agreement in accordance with which it was alleged to have been executed. No receiver was ever appointed in this cause. On October 6, 1894, the endowment association filed its bill against the insurance company, alleging fraud and want of consideration in the transaction between the two concerns, and praying for (1) the annulment of the transfer by the association to the company of its property and of the deed aforesaid, and a reconveyance of the property to the association, (2) an injunction *pendente lite* against the company, (3) a receiver to collect the rents and profits of the association's real estate *pendente lite,* and (4) general relief. On this bill, and on November 6, 1894, receivers were appointed to take charge of the association's property and to hold the same subject to the further order of the court, and an injunction against the company was granted.

Thereupon, the appeal from her judgment having been dismissed on November 9, 1894, and her execution having been returned *nulla bona* on the following day, and the receivers having taken possession of the property of the association and the same being in charge of the court, Mrs. Stuart, on November 15, 1894, intervened in the suit between the association and the company.

Thereafter, and on December 1, 1894, the Ball suit and that between the association and the company were, by order of court, consolidated.

While the proceedings were at the stage thus indicated, namely, on January 17, 1895, an order, dated December 1, 1894, was filed in the suit between the association and the company, directing the receivers to sell all the property of

the association in their hands, except books, papers, and documents, but not to convey any of the property until any sale or sales should have been duly reported to the court and by it finally ratified and confirmed. The main decree below and the report of the auditor show that this order was carried into effect, but no reports of the receivers are in the record as brought to this court on either appeal. The real estate appears to have brought $22,000.

Upon consideration of all the proceedings and testimony in the four causes mentioned, the court below, on June 27, 1896, passed the decree heretofore affirmed by this court. That decree provided as follows: (1) That the deed of August 9, 1894, be set aside and held for naught; (2) That the net proceeds of the real estate described in the deed and sold be held liable *only* for the payment of claims under certificates of the association, in such shares and proportions as the court might determine upon receiving the auditor's report; (3) That the causes be referred to the auditor to state the account of the receivers, and to report, after notice to all concerned, the claims under said certificates involved in the proceedings and such other similar claims as might be presented, and the several sums to which such claimants might be entitled; and (4) That the auditor also report as to such costs and counsel fees as might be a proper charge upon the fund in the hands of the receivers. Pursuant to the requirements of this decree, the auditor, by " due notice by publication in daily newspapers and by postal notices and otherwise," called upon " all concerned " to present their claims before him, and after hearing all claimants who presented themselves filed his report on July 31, 1900. The auditor felt himself bound by the terms of the decree to consider only the proceeds of the real estate, including rents collected by the receivers; he excluded from consideration the proceeds of sale of the personal property.

As respects distribution to the certificate-holders, the auditor divided these into two classes: (A) what he called going certificate-holders, and (B) holders of death claims. In the former he included all living holders and all holders

who died after August 30, 1894, the date of the filing of the
Ball suit, and in the latter all beneficiaries of holders who
died before that date, whether their claims had been put in
judgment or not.    The rate of distribution to the latter was
a fraction under nine-tenths of 1 per cent. the number of
claims presented by the former, nearly 1,000.

In denying priority to the claim of Mrs. Henry Anne
Stuart, the auditor in his report, after reciting the pleadings
and stating that Mrs. Stuart did not claim in her petition that
the real estate was subject to the lien of her judgment, said:

"At this point it may be convenient to dispose of the claim
that the petitioner is entitled to a lien by virtue of a by-law
of the association.    There are two by-laws which may be
taken as those upon which this claim of alleged lien is based,
one providing that death claims shall be paid from the in-
come as they become due and payable, and the other provid-
ing that the capital stock, together with the reserve fund, shall
be held at all times liable for the security of the certificate-
holders.    In this connection it may be well to note the pro-
visions of the contract of insurance or certificate of endow-
ment, bearing in mind that the insured were divided into
classes, and on the death of a member, if I may use that
term, of a particular class, assessments were made upon all
other holders of certificates in that class, while the beneficiary
of the insured (deceased) was entitled to receive a specified
amount named in the said certificate.    The certificate or
contract of insurance makes no mention of the by-laws re-
ferred to in this connection, but is neither more nor less than
an agreement upon the part of the association to pay the sum
specified in the certificate upon the acceptance of due notice
and proofs of death, and a condition of undertaking on the
part of the insured to pay the assessments specified in said
certificate upon notice of the death of the person holding a
certificate in the same class.

" Do these by-laws, however, create any other or greater
lien than the general doctrine that the property of a corpora-
tion is answerable to its creditors in preference to its stock-
holders?    Do they create such a trust on the property or

assets of the association that upon the death of Charles Stuart that property became affected with a lien to the extent of the certificate of insurance? Or was the corporation, by virtue of such a lien, prevented from disposing of its property unaffected by the lien? It is clear to me that it was not the purpose of these by-laws to create a trust or lien in the legal signification of the term or by way of preference, but rather to pledge its funds and property for the satisfaction of its creditors. The justice, determining this case in special term, states that in his opinion this by-law (referring to article 17) did not mean any more than the general principles of equity requiring that the property shall be so far liable all the time to the claims of creditors that it could not be disposed of to the benefit of stockholders. It may be observed here that in August, 1894, this association had no reserve or surplus fund. Its real estate, which comprised practically all of its substantial assets, was the representative, in part at least, of its capital stock.

" I am quite clear in my conviction that neither the charter, by-laws, nor contract of insurance created such a trust as to vest the beneficiary with such a lien upon the corporate property as is now claimed by counsel.

" In this reference it is contended by counsel for the petitioner that she is entitled to have her claim paid in full by way of priority to all other claims for the reasons:

" First. That her judgment constituted a lien on the real estate and the first lien, and therefore is entitled to priority in payment.

" Second. That being the first judgment creditor filing a judgment creditor's bill, she obtained the first equitable levy on said real estate, and is, therefore, entitled to priority in payment.

" Third. That being the first death claimant, her claim became payable before that of any other creditor, and under the terms of her policy and the by-laws of the association she is entitled to priority of payment.

" Referring to the first reason assigned in support of the claim of priority, to-wit, that the judgment became a lien on

the real estate at the time of its entry, it is asserted by coun-
sel that the conveyance or deed by the association to the in-
surance company of August 9, 1894, was not the deed of
the association, and therefore no title passed to the said com-
pany, but that the legal title at the date of the judgment re-
mained in the association, whereby the judgment became a
lien thereon.

" In the same line it is argued that, admitting the said
deed to be the deed of the association, it is also *ultra vires*
and void.

"And further that, admitting it to be the deed of the as-
sociation, it was in fraud of creditors, and therefore void.

" The complainant association was organized under the
provisions of the Revised Statutes of the District of Colum-
bia, section 533 and folio, found on page 67 of the said Re-
vised Statutes. Section 533 provides that "Any three or
more persons who desire to form a company for the purpose
of carrying on any kind of insurance business in the District
may make, sign and acknowledge, etc., and file in the office
of the recorder of deeds a certificate in writing in which
shall be stated the corporate name of the company and the
object for which it was formed, the term of its existence, the
amount of capital stock and number of shares, the number
of trustees who shall manage the concerns of the company
for the first year and their names, etc."

" Section 554 provides that ' after the filing of such cer-
tificate the persons signing and acknowledging the same and
their successors shall be a body politic and corporate and
they and their successors shall by their corporate name, be
capable of purchasing, holding, and conveying any real and
personal estate whatever which may be necessary to enable
the company to carry on its operations named in such certifi-
cate,' ' but shall not mortgage such estate or give any lien
thereon except in pursuance of a vote of the stockholders of
the company.'

" Section 555 provides that the stock, property, and con-
cerns of such company shall be managed by not less than

three or more than nine trustees, who shall be stockholders, etc.

" Section 559 provides that the trustees shall have power to make by-laws prescribing the duties of officers and servants and for carrying on all kinds of business within the objects and purposes of the company.

" The alleged conveyance of the real estate described recites in the premises that it is an indenture made between the Washington Beneficial Endowment Association, of the first part, and the Commercial Alliance Insurance Company, of the second part, and after words of grant, description, etc., proceeds as follows, 'And the said Washington Beneficial Endowment Association has constituted and appointed and by these presents does constitute and appoint Lawrence Gardner president of the said association its true and lawful attorney-in-fact irrevocable and for it and in its name to acknowledge and deliver these presents to the end that the same may be made a matter of record.'

" ' In testimony whereof the said party of the first part in accordance with an order of the stockholders, a certified copy of which is hereunto annexed, have caused these presents to be signed by Lawrence Gardner its president and its corporate seal to be hereto affixed.'

" The signature to this paper is ' Lawrence Gardner, president, W. B. E. A.'

" With this document and as a part of it there is a certificate by the secretary that at a special meeting of the stockholders after due notice at the office of the association August 9, 1894, a resolution was adopted directing the president to convey in fee-simple the title to the said real estate to the Commercial Alliance Insurance Company for such consideration as he might deem advisable, etc.

" The contention of counsel touching this conveyance is:

" First. That its execution is not in proper form to make it the deed of the corporation, that the name of the association should appear in the signature with the words ' By Lawrence Gardner, president.'

" Second. That a necessary prerequisite to the validity of

the conveyance was the direction or authority of the trustees made in due form.

"Several authorities are cited by counsel in support of both propositions, from which it would appear that the execution of the deed was informal and imperfect. Whether that would deprive the conveyance of all validity, legal or equitable, may be a matter the determination of which is unnecessary if my view of other existing conditions be correct.

"As to the second proposition, the requirement of law that the estate of the association should not be mortgaged or any lien given thereon except in pursuance of a vote of the stockholders is to be considered in connection with the fact that such a vote was given at a meeting at which all of the trustees were present or represented.

"The trustees are thus charged with full knowledge in advance of the proposed conveyance.

"I find in a comparatively recent cause in the Supreme Court of the United States, *The Union Pacific Ry. Co.* v. *The Chicago, Rock Island & Pacific Ry. Co.,* 163 U. S. 564, a decision that the ratification of a contract of a corporation by a board of directors appears without any affirmative action on their part when the execution of the contract is entered upon with full knowledge of the directors. After the execution of this conveyance it was practically ratified by the trustees by the acceptance of part of the consideration received from the grantee in payment of the stock respectively held by them in the association, knowing as they did the source from which the fund was derived.

"But admitting that this conveyance was not authorized by the directors or trustees, and admitting further that a transfer of all the property of the association was beyond its power under the law and the charter, these facts become less material as I view the existing conditions at the time of the entry of the judgment.

"First. I am of the opinion that at the entry of the judgment the Beneficial Endowment Association was not an existing corporation; that it was dissolved by the transfer of

all of its property, assets, and business, and by the fact that there was at that date neither stock of the association nor stockholders.   The assertion of the officers of the association that all of the capital stock was purchased by and transferred to the insurance company is not sufficiently established by the proof.   It is denied by the parties who represented the company in the negotiations and agreements with the association, and their version of the transaction is strengthened by the law of the company's domicile prohibiting the acquirement or holding the stock of another corporation.

"The stock book of the association records the transfer to the insurance company on or about the 9th of June.   As it was not accepted or taken by the company, it remained in possession of the association.

"Some of the certificates were not delivered to Gardner until later, but he seems to have had authority to dispose of the stock and he treated it accordingly, taking the money received from the insurance company and holding it not as funds of the association, but for payment to the stockholders for their stock.   For that reason he deposited the money to his own credit in another bank than that in which the association kept its account, and checked it out to the several parties as they called for it.

"I am of the opinion that the stockholders parted with the ownership of the stock on the 9th of August, and, as the association could not hold it, the inevitable result was its immediate extinguishment.

"It follows as a necessary consequence that the corporation was dead.   It could not exercise any corporate function.   It could not sue or be sued.   No process of any kind could be served upon it.   All suits against it abated, and with them the suit of Mrs. Stuart.

"I am reminded that in these consolidated cases the association has been recognized by the courts as capable of suing and being sued.

"The want of such capacity by the civil death of the corporation was not made manifest to the court until the cases were submitted for adjudication.   The condition was only

developed in the proof then presented.   Then the court had
in the combination of suits sufficient proper parties, complete
pleadings and satisfactory proof to sustain its jurisdiction
and decree.

"Another reply to the claim of lien in behalf of this judg-
ment is that the bill of Ball and others filed on the 30th of
August, 1894, had the effect of a ' *lis pendens* ' and served
to protect the property and assets from all interference either
by judgment, decree, incumbrance, or otherwise, without the
limits of that proceeding.   I have already expressed my
opinion as to the standing of the Ball bill on the question
of jurisdiction; and, without discussing the question of the
*lis pendens* in detail, I am of the opinion that the subsequent
action of the court in taking possession of the property and
assets of the association relates back to the filing of that bill
and had the effect of a ' *lis pendens* ' in protecting the prop-
erty and assets from interference.

" In view of the conditions I have related as existing at
the date of the entry of the judgment, it seems to me that
the suit of Mrs. Stuart by reason of the civil death of the cor-
poration prior to October 1, 1894, must be treated as having
abated; but if we concede that the plaintiff was not pre-
vented from prosecuting her suit to judgment, there still re-
mains the inquiry whether she thereby acquired a lien upon
this real estate.   The ordinary lien of a judgment carries
with it the right of execution, levy, and sale.   Could the
judgment plaintiff have exercised that right in this case ?   I
am of the opinion that she could not; and for some reason it
would appear that the judgment plaintiff, although claiming
that the legal title had not passed by deed to the insurance
company, was satisfied that the property was not subject to
the levy of an execution, for we find in the record of the law
case a writ of *fieri facias* issued on November 9th and re-
turned by the marshal on the following day, ' *Nulla bona*,'
that return being made by the order of the plaintiff's attor-
neys indorsed on the writ.   Having pursued her remedy
at law to that point, she abandoned it and selected another
remedy.

"And this recognition by her of the obstacles in the way of levy and sale under the execution is in accord with the averments and prayers of her petition, which distinctly recognizes the validity of the transfer to the Commercial Alliance Insurance Company, and counts upon the undertaking of the company to hold the property in trust for her claim and that of all other beneficiaries under endowment certificates having liens by virtue of the by-laws.

" For the purpose of this reference I must hold that neither the entry of the judgment nor the filing of the petition gave to Mrs. Stuart's claim any priority in the distribution of the assets of the association."

Mrs. Stuart, and Mr. Gilbert, receiver of the Commercial Alliance Life Insurance Co., both filed exceptions to the auditor's report, and, their exceptions having been overruled by the lower court and the report having been confirmed, appealed to this court.

The further material facts will be found stated in the opinion.

*Mr. Henry E. Davis* and *Messrs. Padgett & Forrest* for the appellant Stuart.

*Mr. Henry O. Hotchkiss* and *Mr. Thomas M. Fields* for the appellant Gilbert, receiver, etc.

*Mr. Andrew A. Lipscomb, Mr. S. F. Phillips* and *Mr. Frederick D. McKenney* for the appellees the Washington Beneficial Endowment Association and others.

Mr. Justice MORRIS delivered the opinion of the Court:

These causes were before us on a former appeal and are reported in 10 App. D. C. 316–365, and, as the facts are there stated as fully as seemed to be necessary, they need not here be repeated.   An appeal to the Supreme Court of the United States having been dismissed by that court for

want of jurisdiction, the causes went back to the Supreme Court of the District of Columbia for the taking of the audit and account directed by that court in its decree, which was affirmed by this court.    Such accounting was had before the auditor, that officer returned his report to the Supreme Court of the District; exceptions thereto were filed, and the exceptions were all overruled, and a decree was rendered ratifying and confirming the report, and yet not in terms decreeing any distribution of the fund in the hands of the receivers.

From this decree the causes are now brought here by appeal.

It will be recalled that here there were originally some three or four different causes that were consolidated with each other, and that at the former hearing we had occasion to comment on the irregular and defective character of the pleadings in all the causes.    The result of these irregularities has now become more glaringly apparent.    But, as we said at the former hearing, there being a fund in court to be distributed to those who are lawfully and justly entitled to it, we cannot permit the imperfections of the pleadings to stand in the way of a proper distribution, especially as both the companies concerned, the Washington Beneficial Endowment Association and the Commercial Alliance Life Insurance Company of New York, are now understood to be defunct for all practical purposes other than the consummation of these suits.

We are confronted, however, with the difficulty that the printed record before us is evidently incomplete.    The schedules referred to in the auditor's report, and intended to constitute part of that report, are not to be found in the record. Their omission leaves us in the dark as to the amount of the fund to be distributed, and leaves us in some doubt as to the actual mode of distribution.

Of course we understand that one of the schedules, that designated as schedule B, has been very properly omitted, on account of its voluminous character, as containing merely the names of about a thousand certificate-holders of the en-

dowment association, with the comparatively small and unimportant sums allowed to each person in the distribution. These names and amounts undoubtedly are of no importance whatever in an appellate tribunal, when there are no exceptions based upon such individual allowances; but the sum and substance, and the tenor and purport of the schedule, if it was desired to omit the schedule itself, might well have been agreed upon between the parties and given in a brief paragraph.

Again, the existence of a schedule B would seem to imply that there was also a schedule A, wherein the gross sum and the allowances out of it were included.    In fact, it is quite evident from the record that there were more than one schedule; but neither have we any of these schedules in the record, nor are we advised as to their contents.    In the very laudable desire to curtail the printed record too much is left to inference.    It would have been easy in half a page to supply all of which we now have only conjecture.

We assume, however, that the controversy before the auditor, and now before this court on the exceptions to his report, is fourfold.    *First,* there is the claim of William T. Gilbert, receiver of the Commercial Alliance Life Insurance Company of New York, to receive the whole amount of the fund in the hands of the receivers in this case, on the ground that the contract between this company and the Washington Beneficial Endowment Association, which was heretofore vacated on the ground of fraud, was a valid and binding contract; and that the property sold by the receivers was, therefore, the property of the Commercial Alliance Company. *Secondly,* there is the alternative claim of the Commercial Alliance Company to reimbursement of the sum of fourteen thousand dollars paid by it in pursuance of its contract with the endowment association, which, it insists, should come out of the fund before there is any distribution whatever. *Thirdly,* there is the claim of Mrs. Henry Anne Stuart, intervenor in the suit of the endowment association against the Commercial Alliance Company, and complainant in one of the suits consolidated with it, for the payment of her

judgment in full as a preferred claim before those of any of the other certificate-holders. *Fourthly,* there is the claim of the certificate-holders in general that they should all, including Mrs. Stuart, be paid equally and ratably, without any priority in any one. We understand that it is upon the basis of this last proposition that the auditor has made distribution of the fund.

There are some other issues also raised, notably one in regard to the allowance of counsel fees and costs of suit, which amounted to a considerable sum. These will be noticed more in detail hereafter.

1, 2. With reference to the first and second of these claims, those of the Commercial Alliance Company, what was stated by us in the former hearing must yet suffice. If the position which we then assumed in affirmance of the decision of the court below was right, to the effect that the Commercial Alliance Company had acquired no just or valid title to the property of the endowment association, and that its payment of fourteen thousand dollars to the stockholders of the endowment association was not a payment which should be allowed out of the property of this latter in derogation of the equitable rights of the certificate-holders of the endowment association, the auditor was entirely right in excluding the claims of the Commercial Alliance Company. The remote contingency to which we then referred, that the Commercial Alliance Company might be entitled to come in and receive any balance of the fund that might remain after the satisfaction of the certificate-holders and other creditors, has not been realized. It would seem that the fund is wholly insufficient to allow more than a small dividend to the certificate-holders.

3. Next in order is the claim of Mrs. Henry Anne Stuart to the payment of her judgment in full before any distribution is made to the other certificate-holders. This priority she claims on three grounds: 1st. Because her judgment from the time of its rendition was a lien on the real estate of the endowment association, which had been fraudulently sought to be transferred to the Commercial Alliance Com-

pany, and therefore became and remained a lien on the proceeds of its sale in the hands of the receivers; 2d. Because she was the first judgment creditor to file a judgment creditor's bill in equity, and she thereby acquired an equitable lien on the real estate sought to be recovered, and on the proceeds of the sale of it by the receivers; and 3d. Because in the order of time she was the first death claimant; that is, that her claim, by virtue of the death of the person whom she represented, was the first of all those now in existence to become fixed and absolute and to become a certain indebtedness of the association, while the claims of all other certificate-holders remained mere possibilities and were not debts of the association in any proper sense; and that, therefore, under the terms of her certificate and by virtue of the by-laws of the association, such claim became payable before that of any other certificate-holder.

The auditor in this case proceeded upon the theory favored by courts of equity, that equity is equality. And it is true that courts of equity usually seek to put all the creditors of an insolvent estate, whether the estate be that of a deceased person or that of a defunct or moribund corporation, upon the same footing as to the payment of their claims, and in general to allow no preferences between them. Yet not all equality is equity; and justice oftentimes demands preferences. The equality which is to be sought is generally rather equality between members of a class than between different classes of individuals.

In the settlement of the affairs of insolvent insurance companies, whether they be purely joint stock organizations established to make money for their stockholders; or of the mutual class, wherein, although the interest of the stockholders predominates, yet there is some supposed participation in profits by the policy-holders; or of the endowment kind, such as was the Washington Beneficial Endowment Association, wherein, over and above a guaranty fund contributed by stockholders, the principal resource of the association is not from premiums paid at regular and stated intervals, but from assessments, regular in amount, with ref-

erence, however, to difference of class, but irregular and un-
certain in the time of their levy, dependent on the death of
certificate-holders, it may be assumed that there are usually
three classes of persons concerned: 1st, ordinary creditors;
2d, policy or certificate-holders, who in a sense are to be re-
garded as creditors; 3d, stockholders, who likewise, although
in a yet different sense, are to be regarded as creditors.    It
is well-settled law, of course, and it is the plain dictate of
justice, that all these are not entitled to come in equally and
share in the distribution of the property of an insolvent cor-
poration.    On the contrary, it is well settled that they should
be preferred in the order enumerated.    There may at times
be preference of judgment debts over simple contract debts,
and even of simple contract debts as between themselves with
reference to the order of time in which they have been con-
tracted.

If Mrs. Stuart's claim in the present case were that of an
independent third person, not otherwise connected with the
endowment association, but who had, let us assume, become
its creditor by selling supplies to it, such as the furniture in
its office, we presume, whether her claim was reduced to
judgment or not, there would be little doubt of her right to
priority of payment out of the assets of the association, be-
fore any distribution of such assets between either the cer-
tificate-holders or the stockholders.    When the claim has
been reduced to judgment the right to priority of payment
becomes more imperative.

Now, we find no difference in principle between such a
claim and that actually here in controversy.    Charles Stuart
had been a certificate-holder of the association.    He had died
several years before the troubles of the association involved
in these proceedings commenced.    By his death the contract
between him and the association, which up to that time had
been executory and conditional on both sides, became fixed
and absolute.    All liability on his part, or on the part of his
estate or representative, to make any further payments to
the association, either in the way of assessments or otherwise,
ceased; and the liability of the association to him, which

theretofore had been contingent and might never have become absolute, became a definite, positive obligation to pay a fixed sum of money.    The relation between the association and the representative of the deceased became that of debtor and creditor in the ordinary sense of those terms, precisely to the same effect in law as though the representative of the deceased had sold goods to the association for which she had not been paid.

It is a mistake to argue, as has been done in this case, that the engagements and liabilities of the certificate-holders of this association were to each other, rather than to the association; and that they looked to the assessments to be made at the death of each member as the source from which the amount of his certificate was to be paid.    On the contrary, it is very plain from the face of the certificates and from the by-laws of the association, that it was the association that became obligated to the individual certificate-holder, and not his associates, except indirectly; and that the death claims were payable absolutely and without reference to the assessments, and might even be paid out of the guaranty fund, if necessary — although, of course, it is true that the association looked to its receipts from these assessments either to pay the claim, or to reimburse itself, if it had already paid it.    And it is equally clear that the liability of the individual certificate-holder was not to make any payment to his associates, but to pay certain sums from time to time to the association, not fixed sums at stated times, as in ordinary insurance companies, but sums fixed in amount and payable on uncertain occasions, that is, upon the happening of the death of a certificate-holder of the same class.    In other words, the contract of the parties in this regard did not differ substantially from that of the ordinary policy of insurance. In the one case, the amount payable in each year and the time of payment are both certain; in the other case, the amount of payment upon each death is certain; but the amount of payments in a year and the times of payment are necessarily uncertain.    But the contract, whether certain

or uncertain, is between the individual certificate-holder and the association.

Upon the death of Charles Stuart, Mrs. Stuart, as his representative, became entitled to make demand upon the association to pay the amount of the certificate, and upon its refusal to pay, to sue and obtain judgment, and to enforce the judgment by execution upon the property of the association; and this she proceeded to do.    Under ordinary circumstances, no other certificate-holder, certainly no certificate-holder whose claim had not been matured by death, could have reasonably interposed either to prevent the voluntary payment of such claim, or of the judgment into which it became merged, by the proper officers of the association, or its enforcement against the property of the association by levy and execution.    Now, does the insolvency of the association accruing long after the right had accrued, or does an act of misconduct on the part of its managers, such as was the attempted transfer of its assets in this case, or does the institution of proceedings in equity looking to the winding up of the affairs of the association, justify the establishment of a different rule?    It is difficult to see how a right acquired by a creditor can be displaced by a wrong committed by the association, or by the act of other persons having no privity with the creditor, but who seek merely to redress the wrong that has been committed.

The fact that Stuart was originally in the same category as other certificate-holders of the association does not alter the situation.    The mutual agreement of all the parties was that the claims of those who died first should be paid out of the funds of the association, and directly or indirectly by the assessments levied upon the survivors.    The contingency of death, which made the representative of him who died a creditor of the association, at the same time made the survivors debtors of it to the extent of their assessments.    Indirectly the survivors became debtors to the estate of the deceased; and the enforcement of the assessments might possibly have been required by *mandamus,* if the association had failed or refused to call for them or to demand their

payment.   It cannot be that, if afterwards the association falls into difficulties and becomes insolvent, these parties who are debtors to the association, so far as Stuart's claim is concerned, can require that claim to be prorated with their own indefinite claims, which become matured only by the insolvency of the association.   It would be possible that they themselves could cause this insolvency; and yet they would be enabled to take advantage of their own wrong, if thereupon they could be permitted to share equally with those who by no possibility could have had a hand in such insolvency.

Courts of equity seek as far as possible to give effect to the contracts of parties, if such contracts are legal and valid; and we must hold the contracts of the parties in these causes to have been legal and valid, notwithstanding the false basis upon which they are founded.   As applied to the Stuart case the contracts in this instance of the certificate-holders other than Stuart was that they were to pay certain assessments to the association in order to enable the association to pay Stuart.   These assessments have not been paid.   It is true they are no longer payable on account of the insolvency of the association.   But it is not equitable that the certificate-holders should be relieved from payment of them, and yet at the same time withdraw all the other assets from liability for the Stuart claim, and apply them to their own benefit.   For this would be the result of requiring the Stuart claim to be prorated with their own.

These views are believed to be not only in accordance with the dictates of reason, but likewise in substantial accord with the tenor of the decisions of the courts.   No case precisely in point has been shown to us; but the principle that preference should be allowed where a superior equity is shown has been established in various cases.   See *Boston & Albany RR. Co.* v. *American Casualty Insurance Co.,* 82 Md. 535; *People* v. *Security Life Ins. & Annuity Co.,* 78 N. Y. 114, 128; *Attorney-General* v. *North American Life Ins. Co.,* 82 N. Y. 172, 193; *People* v. *Globe Mutual Ins. Co.,* 91 N. Y. 174; *Vanatta* v. *N. J. Mutual Life Ins. Co.,* 31 N. J. Eq.

15; *Commonwealth* v. *Mass. Mutual Fire Ins. Co.,* 112 Mass. 116; *S. C.,* 119 Mass. 45.

In the case cited of *People* v. *Security Life Ins. & Annuity Co.,* 78 N. Y. 114, 128, which has not been overruled either expressly or by implication in any subsequent case, as claimed by counsel, it was held, with reference to ordinary policies of insurance, that death claims which had matured were entitled to no preference over the claims of unmatured policy-holders in the settlement of the affairs of an insolvent insurance company; but an exception is expressly made in regard to mutual companies in which " the holders of running policies were liable to pay death losses." And this exception was noted in consequence of the citation of the opinion of Chancellor Runyon, of New Jersey, in the case above cited of *Vanatta* v. *N. J. Mut. Life Ins. Co.,* in which he held that death claims were entitled to such preference.

The case of *Vanatta* v. *New Jersey Mutual Life Ins. Co.,* 31 N. J. Eq. 15, bears a very close resemblance to that now before us. There, as here, was an insurance company which did an insurance business by way of assessments levied from time to time according as deaths occurred, substantially as this Washington Beneficial Endowment Association did. It became insolvent, and a receiver was appointed, and it was found necessary to wind up its business. The question of priority arose between its different policy-holders. The court said:

" If it be considered that the policy-holder whose claim becomes due is not himself liable to assessment, but is to receive the amount of his insurance from the company, and when his loss is paid he ceases to be a member, and if it be not paid he may maintain suit against the corporation, it is obvious that the analogy of partnership will not hold. His contract with his fellow-members was not to bear any part of his own loss. He was to help to bear theirs, if theirs happened before his. His fellow policy-holders bound themselves, in consideration of his payments and his obligation to contribute, if necessary, to pay the money which would be due on their contracts, if theirs matured before his, to

contribute, if necessary, to the payment of the money which would be due on his if it should mature before theirs; and when the contingency happened, when the period of payment arrived, the mutuality which up to that time had continued at once ceased. The policy-holder whose policy became due thereupon, *ipso facto* became a creditor.

" If this view be correct, it follows that all policies, which were due when the decree of insolvency was made, are entitled to be paid as debts of the company, and are not to be put on the same footing as claims for return of premiums, and it makes no difference whether the claims were in judgment or not.    *    *    *

" The death claims, including those in which the death happened, before the decree of insolvency, and endowment policy claims which became due before that decree, including all on which all premiums, which ever could have been required to be paid had the company continued to be solvent, had been paid before the decree, will rank as debts; and the policy-holders will be assessed, if necessary, according to the provision of the charter, for the payment of any deficiency of assets to pay them. Should there be any surplus of assets after payment of the expenses of the trust and the debts, in which are included the before-mentioned death and endowment claims, it will be distributed among the other policy-holders."

In the case of *Commonwealth* v. *Massachusetts Mutual Fire Insurance Co.,* 112 Mass. 116, which was, it is true, the case of a fire insurance and not of a life insurance company, but in which in this regard the principle was the same, it was held by the Supreme Court of Massachusetts, in the language of the syllabus to the case, that, " when a mutual fire insurance company becomes insolvent, the previously accrued profits which have been credited to the policies do not belong to the policy-holders, but are funds for the payment of losses." And when the same case was before the court a second time, it was held that any excess of assets over and above what was required for the payment of losses upon policies whereon loss had accrued, was divisible among those who had con-

tributed to such payment by the payment of their assessments (119 Mass. 45). See also *B. & O. RR. Co.* v. *B. & O. Relief Assn.*, 77 Md. 566.

It would seem that the rule of priority of payment for contracts of insurance that have become absolute, is the necessary result of the engagements of the parties with each other.

We are of the opinion, therefore, under the whole scheme of this endowment association, and under the contracts made with it by certificate-holders, the indebtedness of the association to Mrs. Stuart, which became fixed and absolute long before the insolvency of the association, and which was finally established as an absolute liability by the judgment that was rendered upon it, became a preferred claim, entitled in equity to be paid before any distribution of the assets of the association among those who were themselves obligated indirectly to such payment.

4. With reference to the other certificate-holders no exceptions have been filed to the auditor's report, and there is nothing for us to consider. That they are entitled to a distribution among them of the remainder of the assets of the association, after the payment of the Stuart claim, we regard as beyond question. It has been held that the Commercial Alliance Company is not entitled to them, and is not entitled to participate in any distribution until the certificate-holders are satisfied; and as the assets are far from sufficient to pay the certificate-holders, there is, of course, nothing for the Commercial Alliance Company. There is nothing for the endowment association, for it is hopelessly insolvent, and has gone out of existence. There is nothing for its stockholders, for its stockholders cannot come in [in] advance of the certificate-holders, or equally with them. The certificate-holders, who, while the association was in active existence, and before it became insolvent, had only possibilities that might thereafter accrue into claims, and who at that time were debtors rather than creditors of the association, became actual creditors by its insolvency and the settlement of its affairs. Their liability to contribute further in the way of assessments was thereby terminated; and, as they had

paid to the association various sums from time to time on the faith of their contracts of insurance, they became entitled to an accounting as to the present value of such contracts on the basis of what is designated as the surrender value of their certificates or policies of insurance.  For that these certificates have a surrender value under the circumstances, equally as ordinary policies of insurance under similar circumstances, we have no doubt.  Equity has established such surrender value in regard to the ordinary policy; and the theory has been accepted and extended by the insurance companies to cases where the insured desire to withdraw from the contract, while it is yet executory.  There is no reason to refuse to extend the same rule to these certificates of endowment.

5. Among the exceptions filed to the auditor's report by Gilbert, as receiver of the Commercial Alliance Company, were several to the allowance of counsel fees and other costs. These he has withdrawn upon the record; and they would not therefore be noticed here, were it not that counsel in the so-called Ball case, or Equity No. 15,809, question his right to so withdraw them, so far as the withdrawal has the effect to allow fees to other counsel than themselves.  We greatly question the right of any of the parties to these causes to have counsel fees allowed them; but we do not see how we can pass upon the matter.  It is the right of parties who file exceptions to withdraw them.  They are not bound to let them stand because other parties may find it to their advantage to have them retained.  If counsel in the Ball suit had desired to have the question of counsel fees reserved to this court, they should have themselves taken exception to the allowance of such fees as they regarded objectionable. There is nothing before this court to pass upon in the matter of counsel fees.

In consequence of the failure of the auditor to allow the claim of Mrs. Henry Anne Stuart a priority over those of the other certificate-holders, and the approval of his report in this regard by the Supreme Court of the District of Co-

lumbia, we think there was error in the decree of that court in the premises, for which it should be reversed.

The decree appealed from will be reversed, and the cause will be remanded to the Supreme Court of the District of Columbia, with directions to have the account restated in accordance with this opinion. Under the circumstances the costs of this appeal will be paid out of the fund in the hands of the receivers. And it is so ordered.          *Reversed.*