# SECURITY FINANCIAL INSURANCE CORPORATION v. INSURANCE COMMISSIONER, STATE OF MARYLAND

[No. 273, September Term, 1962.]

572

*Decided June 10, 1963.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

Submitted on brief by *Keith L. Seegmiller* and *Cecil E. Custer* for the appellant.

*Harrison M. Robertson, Jr., Special Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City, which assumed jurisdiction over the property and business of Security Financial Insurance Corporation (Security) for final liquidation of said corporation, and appointed John H. Coppage, Deputy Commissioner of Insurance, receiver to effectuate said liquidation.

Suit was instituted by the Commissioner of Insurance against Security under the provisions of Code (1957), Article 48A, Section 59 (all future references to sections will relate to Article 48A unless otherwise specified), which permit the courts to assume jurisdiction over an insurance company for the appointment of a receiver and final liquidation on any one or more of four grounds: when the commissioner shall have rea-

son to believe the company is insolvent, its business is fraudulently conducted, or that its assets are not sufficient for carrying on its business, and during any noncompliance by the company with the provisions of Article 48A of the Code.[1] The chancellor found against Security on all four grounds (although stating at one point that it was unnecessary to make a "specific" finding of fraud). However, it will be unnecessary for us to consider all of these grounds separately. The Commissioner ordered appellant to set aside certain claim reserves, which it refused to do. It concedes that if these reserves were properly required, it is insolvent, its assets are not sufficient to carry on its business, and it is in noncompliance with the provisions of Article 48A. It, of course, contends that the Commissioner was without authority to order the claim reserves. We find it unnecessary to determine the question relating to claim reserves. We shall direct our consideration to the last three grounds mentioned in Section 59, as our holdings with reference to them are sufficient to decide the case.

Security is a corporation organized and existing under the laws of Maryland, its articles of incorporation being approved in July of 1959. The authorized capital stock of the company is 500,000 shares of common stock having a par value of $1.00 per share and 50,000 shares of preferred stock having a par value of $100 per share. No preferred stock has ever been issued, and it appears that all of the 250,000 common shares issued to date are now owned by two Canadian corporations known as Channel Investments, Ltd., and Lock Securities, Ltd. The stock record books of Security show that originally 154,589 of common stock were issued to Channel and 93,411 shares to Lock. The remaining 2,000 shares of the issued common stock were listed in the names of three residents of Baltimore County, all of whom have surrendered their holdings *gratis,* or disclaimed ownership. These shares, or at least 1,500 of them, were subsequently issued to Channel.

The Canadian interests are enshrouded in mystery. All that is known of them is that virtually all the stock of Channel

---

**1.** To these the Attorney General added a fifth ground; the general jurisdiction of courts of equity.

and of Lock is owned by a young Toronto lawyer named David Robert Vine. In evidence are certificates from Mr. Vine that each of his corporations, Channel and Lock, has an authorized capital of 250,000 shares of stock which may be issued for an amount not to exceed $250,000. Ordinarily, this would mean that each share would be issued for $1.00, Canadian currency. Since 248,000 shares of Security stock were initially issued to the two Canadian corporations combined, it would be expected that they would have paid $248,000. Actually the sum of $425,000 was somehow raised to get Security underway in 1959, of which $415,000 is now on deposit with the Maryland State Treasurer in the form of U. S. Government obligations. This means, of course, that Vine's two corporations paid approximately $1.70 per share for the Security stock. Arithmetically it is impossible to reconcile these figures, even without regard to prevailing rates of international exchange. Although the trial of this case below consumed the better part of two calendar weeks, Mr. Vine did not testify; indeed, as far as is known, he has never appeared in Baltimore at all. Instead, there are in the record two undated proxies signed by Vine on behalf of his corporations, Channel and Lock, authorizing a Chicago lawyer, one Henry McGurren, to act for the stockholders who own and control Security. McGurren likewise did not appear as a witness.

The changes in personnel associated with Security present a very unusual sequence of events. The original nine incorporators—nearly all prominent residents of Baltimore County —have long since departed from the scene. The original Board of Directors resigned rather promptly after the Company began operations. According to such of Security's minutes as are in evidence, there ensued a course of procedure in which Mr. McGurren played the principal role. Directors resigned from time to time and were replaced by others designated by McGurren. In the brief span of its existence, Security has had three presidents. At the time of trial and for some time theretofore, the office of vice-president had been unfilled. Two days after the bill for the appointment of a receiver was filed, the secretary-treasurer, who was also one of the three remaining directors resigned. Another man was hastily drafted

to serve as the secretary-treasurer and a director, but it is not certain whether he accepted and qualified. The minutes of the meeting reporting his appointment are unsigned. Apparently, Security encountered difficulty in filling its complement of officers and directors.

The Company maintained an office in the Keyser Building in Baltimore City but the maintenance of the office also was unusual. In July, 1961, the office of president was vacant and the company's counsel persuaded one David F. Woods to accept said office. Mr. Woods testified as a witness for the Commissioner and stated that he had never had any experience in either insurance or the savings and loan business; his field was public relations. As he described it, the company was "more or less in a vacuum." It had no employees and Woods had to engage the Kelly Girl Service to handle his correspondence. Eventually, he managed to get a secretary for himself.

The affairs of Security were to be controlled by a Board of Directors consisting of not less than three, nor more than twenty-one. As far as has been disclosed in the evidence, the number of directors never exceeded five and in recent months before the trial below consisted of the statutory minimum of three. The By-Laws further provide that there may be an Executive Committee of five or more directors, not to exceed seven in number, which shall advise and aid the officers between directors' meetings. No Executive Committee was ever created, and it could scarcely have come into being in view of the reduced personnel of the Board of Directors. The "impression" on the chancellor given by the testimony was that the directors who had managed the affairs of Security were, for the most part, mere figureheads who carried out the will of the persons who actually owned the stock of the corporation.

At any rate, the purposes of Security, as set forth in its charter, were to write fidelity or surety bonds and to underwrite the "deposits, savings and accounts of savings and loan associations, and other financial institutions and organizations." There is no record that the company has ever written

a fidelity or surety bond, but it did issue policies designated "shareholder's guarantee policy" to some thirty savings and loan associations, of which twenty-seven are domiciled in Maryland, while the other three are located in the states of Utah and Idaho. Little is known about the affairs of the foreign assureds except that one witness testified that the deposits of one of those savings and loan associations amounted to about $16,000,000. The total amount at risk of Security has been estimated by the company's President, K. George Christian, as being about $52,000,000, but the audit of Mr. Meredith, Chief Examiner for the Commissioner, fixes the Company's exposure at $65,823,650.98, as of January 1, 1962. The chancellor accepted this figure as being correct because it was the result of an audit rather than an estimate. We cannot say his finding was erroneous.

The nature of Security's business was generally recognized as being of the hazardous variety. There is said to be no other privately owned insurance company in the entire country which writes the kind of insurance undertaken by Security. One possible analogy which can be drawn is with the Federal Savings and Loan Insurance Corporation created by Act of Congress in 1937.[2] Reference to Federal Corporation reveals that it writes similar coverage on federally-insured savings and loan associations throughout the United States under terms and conditions similar to those contained in Security's policy. However, there are important differences between the operations of Security and the Federal Savings and Loan Insurance Corporation. Not only are the resources of the United States Government behind the latter, but it exercises a constant vigil over the affairs of the associations which it insures and requires the maintenance of a substantial reserve in the form of Government Bonds to preserve the stability of its policyholders. Even more important, the Federal Act, as amended in 1961 (P. L. 87-210, 87th Congress, H. R. 7108) requires the Federal Savings and Loan Corporation to accumulate premiums until a reserve fund is set up equal to five percent of all insured accounts and creditor obligations of all

2. See also Chapter 131 of the Laws of 1962.

insured institutions. The federal system recognizes the need for adequate reserves to carry on such a business prudently and with safety for the investing public. Security not only has failed to set up any reserve for the protection of its assureds or their shareholders, but flatly refused to do so upon repeated demands by the Commissioner.

At the time Security applied to the Commissioner for a certificate of authority to engage in the insurance business, it submitted a form of policy which it proposed to use. This form provides for the payment of a deposit premium computed at the rate of one percent for three years—in other words one third of one percent per annum. This is the only form of policy which has ever been approved officially by the Commissioner. Security, however, promptly modified the form of policy which it actually issued by deleting the premium clause just mentioned, and providing for the payment by each policyholder of an "eligibility fee" in a blank amount. This practice was found by the chancellor never to have been sanctioned or approved by the Commissioner. Again, we cannot say his finding was erroneous. It permitted Security to perpetrate numerous acts of discrimination with respect to the rates charged. For example, Security applied to the Commissioner for authority to accept prepaid premiums equivalent to six years' advanced premiums. A number of the insured associations apparently paid such advanced premiums without protest, but others either rejected or ignored Security's demands. In many, if not all, cases the policies continued in effect. This effectuated a form of discrimination in the charging of premiums not sanctioned by law. Thus it is seen that Security has been acting without the full authority of law by writing insurance on a form not approved by the Commissioner with respect to premiums charged. Section 223.

The hazards of Security's underwriting became quite apparent during the year 1961, when conservators or receivers were appointed by various courts for ten of Security's twenty-seven domestic policyholders. One of them, Phoenix Savings and Loan Association, has since been rehabilitated under a plan approved by Judge Oppenheimer, but the other nine at

the time of the trial below were still in conservatorship or receivership, quite possibly for purposes of liquidation. Despite the weak financial structure of Security and the probable liabilities to be incurred as a result of its large underwritings, the officers and directors proceeded to deal with the company's assets in what the chancellor described as a "rather cavalier fashion." In late 1961, a dividend of ten cents a share was declared and the sum of $24,800 was remitted to the two Canadian corporations which owned Security's stock. Strangely, there was no retention of some $3,700 as foreign withholding income tax, and it is conceded that someone in Canada is indebted to the company for that amount, although no attempt has been made to collect it. The directors also ordered payment of salaries to the officers for some six months in advance. Finally, the services of McGurren of Chicago (with no Maryland address) were engaged as special counsel for the sum of $15,000, which was promptly paid to him. McGurren had previously appeared as counsel for Security's owners in Canada. The president of Security was unable to explain to the court, after repeated questions, the nature of the services which McGurren was expected to render.

As the gathering storm approached, the Commissioner directed that a complete study be made of the affairs of Security by his Chief Examiner, Ernest J. Meredith. Mr. Meredith submitted two detailed reports of his findings. In the first report, dated March 14, 1962, he concluded that Security had admitted assets of some $985,994.35 and liabilities, if estimated minimum reserves were carried for policyholders, of $1,512,363.19. This left a deficit, with regard to policyholders, of $526,368.85. In the second and more complete report of Security's affairs, it was found, in light of later developments regarding several assureds then in conservatorship or receivership, that the deficit amounted to $1,481,216.45. If Security did not carry reserves to cover anticipated claims resulting from the inability of its policyholders to pay their numerous depositors, then Security was solvent. However, the Commissioner, alarmed by the financial condition of at least three of the assureds savings and loan associations, notified

Security to set up reserves to cover anticipated losses. The first notice given by letter dated March 23, 1962, and predicated on the first audit by Mr. Meredith required Security to post reserves in the amount of $1,120,000, which was approximately fifty percent of the anticipated losses then made known to the Commissioner. Security flatly refused to comply. As a result of the second audit, the Commissioner later demanded that a reserve in the amount of $2,000,000 should be posted because of the discovery of additional deficiencies in the various savings and loan associations, and again, Security refused to carry out the Commissioner's order.

Security, as a part of its promotional endeavor, prepared and distributed an advertising brochure (Plaintiff's Exhibit No. 47) in which it purported to inform policyholders of the various insured savings and loan associations as to the nature of its coverage, assuring such people that they had nothing to fear in depositing their funds in the insured associations. However, it made no attempt to inform the investing public of the contentions now being advanced by Security in opposition to receivership, namely, that no claims can be made against Security unless the insured Association has been liquidated, and even then, Security has the option of paying in cash or transferring the shareholder's account to other associations. Featured in the brochure (and prominently displayed in the offices of the insured associations) is a conspicuous seal with the language, "Accounts insured by Security Financial Insurance Corporation." The brochure also referred to a "reserve ratio" of the company's assets, a ratio which the figures quoted above show was purely ephemeral.

We have set forth the evidence at some length. Without repeating it, we hold that it is ample to support findings that appellant's assets were insufficient to carry on its business, appellant had been guilty of several acts of noncompliance with the provisions of Article 48A, and its business had been fraudulently conducted.

*Decree affirmed, with costs.*

HAMMOND, J., concurs in the result.