509 A.2d 670

**CHEVY CHASE SAVINGS & LOAN, INC.**

v.

**STATE of Maryland and State of Maryland Deposit Insurance Fund Corporation.**

**No. 9, Sept. Term, 1986.**

Court of Appeals of Maryland.

June 5, 1986.

James J. Cromwell and James C. Chapin (J. Bradford McCullough, Beckett, Cromwell & Myers, P.A., on brief), Bethesda, for appellant/cross appellee.

Robert A. Zarnoch, Asst. Atty. Gen., and Dennis M. Sweeney, Deputy Atty. Gen., (Stephen H. Sachs, Atty. Gen., and Kathryn M. Rowe, Asst. Atty. Gen., on brief), Baltimore, for appellees/cross appellants.

Perry, O. Barber, Jr., Charles M. Darling IV, Stephen L. Teichler, Dennis J. Moss, Mark R. Haskell and Baker & Botts, Washington, D.C., M. Albert Figinski, Ira C. Cooke, Stephen B. Caplis, David R. Sonnenberg and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., Baltimore, for amicus curiae Epicenter Consolidated, Ltd. and EPIC Holdings, Ltd.

Mark H. Tuohey III, and Kirby, Gillick, Schwartz & Tuohey, P.C., on brief, Washington, D.C., for Clayton C. McCuistion and other amicus curiae.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

Chevy Chase Savings and Loan, Inc. (Plaintiff or Chevy Chase), a state chartered association, sues to recover funds it had been assessed for insurance of its accounts through Maryland Savings-Share Insurance Corporation (MSSIC). The defendants are the State of Maryland and the State of Maryland Deposit Insurance Fund Corporation (MDIF), a State agency and successor by merger to the insolvent MSSIC. As a member of MSSIC, Plaintiff had been required by MSSIC's rules to contribute to the capital used by MSSIC in carrying out its programs. Having withdrawn from membership shortly after the MSSIC–MDIF merger, Plaintiff contends that MSSIC's rules relating to the rights of withdrawing members literally oblige the defendants to repay the assessments paid by Chevy Chase. We shall principally hold that as to funds used for insurance purposes, there is no breach of contract and that, as to the funds used for liquidity purposes, the contract has been modified by a constitutional exercise of the State's powers.

## MSSIC

To understand Plaintiff's claim requires a review of MSSIC's purposes, structure, and operation. MSSIC was a product of the 1960 savings and loan crisis in Maryland.[1] *See* W. Preston, *Report of the Special Counsel on the [1985] Savings and Loan Crisis,* 33–35 and n. 5, 43–47 (1986) (Preston). Created by Ch. 131 of the Acts of 1962, MSSIC was a nonstock, nonprofit corporation. Its members were state chartered savings and loan associations that had been accepted for membership under statutes most recently codified as Md.Code (1980), Title 10 of the Financial Institutions Article (FI). The purposes of MSSIC were to:

---

**1.** At the time of the 1960 crisis a number of insolvent associations were "insured" by a private insurer, Security Financial Insurance Corporation, which was also placed in receivership. *See Security Financial Ins. Corp. v. Insurance Commissioner,* 231 Md. 571, 192 A.2d 95 (1963).

(1) Promote the elasticity and flexibility of the resources of members;

(2) Provide for the liquidity of members through a central reserve fund; and

(3) Insure the savings accounts of members. [FI § 10–103.]

Until Ch. 479 of the Acts of 1968, Maryland law had never required that state chartered associations be insured. Chapter 479 mandated that on and after July 1, 1973, all free share accounts be insured by the Federal Savings and Loan Insurance Corporation (FSLIC) or by MSSIC. *See* FI § 9–426 ("A savings and loan association shall become and participate as a member in [MSSIC] or a federal home loan bank.").

The powers of MSSIC were exercised by a board of directors composed of eleven persons, of whom three were appointed by the Governor and the remainder elected by the members. FI §§ 10–108 and 10–109. The directors could adopt bylaws and rules and regulations to carry out the provisions of Title 10, but such action by the directors became effective only if approved by the director of the Division of Savings and Loan Associations, a State agency within the Department of Licensing and Regulation. FI § 10–111. MSSIC was not subject to Art. 48A of the Maryland Code, regulating insurance companies. FI § 10–114. It was exempt from taxation by Maryland or any of its political subdivisions. FI § 10–115. FI § 10–116 specifically provided that "[t]his title does not, and [MSSIC] may not, pledge the faith or credit of this State."

The capital with which MSSIC carried out its corporate purposes was derived from its member associations. Each member was required to "make the investments and pay the assessments, premiums, and other charges that are required for participation in [MSSIC]." FI § 10–107(c). In its internal accounting MSSIC segregated two funds, the central reserve fund (CRF) and the insurance fund. FI § 10–105 required MSSIC to "establish a central insurance

fund and through the fund [to] insure the savings accounts of members." The statutory basis for CRF was FI § 10–103(2) by which MSSIC was to provide "for the liquidity of members through a central reserve fund." By an amendment to the MSSIC statutes first made in 1974 (Ch. 152), the CRF was "not subject to any insurance claim against [MSSIC]." FI § 10–104(c)(4). These statutory provisions were fleshed out by bylaws, rules and regulations of MSSIC, discussed below. The full text of the MSSIC rules and regulations relied on by the Plaintiff is set forth in the appendix hereto.

Pursuant to MSSIC Rule § 3–301, each member, as a condition of membership and thus of insurance on accounts, was required to contribute "as a capital deposit" an amount equal to two percent of its free share accounts. Certificates of deposit evidencing these contributions were issued by MSSIC. Members could carry those certificates on their books as assets, but the certificates paid no interest or dividends. Rule § 3–306. In its accounting, MSSIC charged the liability on those certificates of deposit against the insurance fund.

Chevy Chase bases its claim to return of its capital contributions to the insurance fund on Rule § 3–503, which in relevant part provided:

Any member withdrawing from [MSSIC] ... shall be entitled to receive from [MSSIC] payment of the certificate of deposit ... in the following manner:

(a) A date shall be specified by [MSSIC] for the termination of insurance of free share accounts issued by the withdrawing members, which date shall not be later than twelve months from the date of the notice referred to in Section 3–501 (such date being referred to in these Rules as the "terminal date").

Rule § 3–501 in substance provided that any member which was not in default of its obligations to MSSIC might "withdraw from membership in [MSSIC] upon giving to it twelve months notice in writing of [the member's] intention to

withdraw." On the terminal date the withdrawing member was to receive its *pro rata* share of the *cash* of MSSIC, *see* Rule § 3–503(B) and (C), and a certificate of fractional participation which entitled the terminating member "to its proportionate share of any proceeds resulting from the liquidation of such remaining assets as they are liquidated by [MSSIC]." A fractional participation certificate does "not entitle the holder thereof to any control over the manner, amount or date of liquidation of such assets." Rule § 3–503(D) and (E).

The CRF was treated in Rule § 3–901, which recited that MSSIC "and its members authorize the formation of a Central Reserve Fund to provide for the liquidity of member associations subject to the following provisions[.]" Membership in the fund was mandatory and was effected by subscribing to "Capital Notes" issued by MSSIC.[2] The capital note subscription obligation of a member institution was one-half of one percent of assets for an association having less than $75 million in assets and one and one-half percent of assets for associations having greater assets. Subscriptions were adjusted semi-annually. Capital notes are interest bearing.

There was a CRF committee appointed by MSSIC's board of directors which managed that fund. That committee, in its discretion, could make advances to members, with or without security, for a term of up to one year or, with the approval of the board of directors, for a longer term. Membership in CRF might be terminated by withdrawing from membership in MSSIC. Three months notice to the fund prior to termination of membership was required. "In the event of such termination ... the capital notes shall be surrendered and cancelled and payment shall be made of the investment in said notes plus accrued interest, if

---

**2.** The record does not contain a specimen form of a "Capital Note" evidencing a mandatory contribution to the central reserve fund. Nor does the record contain a specimen certificate of deposit evidencing a capital deposit to the insurance fund.

any...." Rule § 3–901(B)(6). Rule § 3–901(K) further provided:

> Any member having given notice of its intention to withdraw from membership and requesting payment of its capital notes, in accordance with the provision of Section 3–901–B(6) shall be entitled to receive the face amount of the capital notes within six months after notice of its intention to withdraw; in the event the Central Reserve Fund does not have sufficient cash available to pay the withdrawing member the full amount of the capital note, then, in that event the Fund may make partial payments of funds received from maturing securities to the withdrawing member until the full amount due the member is paid. Any such deferred payments shall continue to bear interest as though the member were still an active participant in the Fund.

MSSIC's rules, following § 3–901(B)(8), stated:

NOTE: The Central Reserve Fund shall not be subject to payment of insurance claims against the Corporation by member associations, or their Free Share holders, or otherwise.

For the year ending December 31, 1984, MSSIC's balance sheet[3] reflected assets of $285,647,872, offset by $118,891,754 of liabilities, by a $5,000,000 reserve for insurance losses, and by "Capital funds"[4] of $144,260,100, leaving retained earnings of $17,496,018. The auditors' notes to the December 31, 1984, financials advise that "[i]t is the policy of [MSSIC] to establish a reserve for insurance losses at the time an association requires financial assistance or when

---

**3.** All references to financial statements of MSSIC or MDIF are to statements prepared after audit by a national firm of certified public accountants which has opined that the statements fairly present the financial position of the respective corporation as of the date indicated.

**4.** "Capital funds" are the capital deposits, evidenced by certificates of deposit issued by MSSIC, and carried as liabilities against the insurance fund.

such assistance is anticipated. These reserves are reviewed periodically and adjusted as required...."

## MDIF

MDIF is a product of the 1985 savings and loan crisis in Maryland. On May 14, 1985, at 4:47 p.m. the Governor proclaimed a state of emergency and suspended withdrawals from state chartered associations insured by MSSIC. The events leading to that proclamation are chronicled in Preston, at 19–29. Between February and mid-April of 1985, depositors withdrew approximately $375 million in a "silent run" on certain MSSIC insured associations. Those associations in turn were forced to borrow some $370 million from the Federal Reserve. On May 9, 1985, MSSIC's announcement of a change in management at Old Court Savings and Loan Association (Old Court) caused the runs to escalate and spread to other institutions. On May 10, depositors withdrew $3 million from Merritt Commercial Savings and Loan Association (Merritt). Old Court and Merritt were placed in conservatorship on May 13, 1985, and on that day depositors withdrew $116 million from MSSIC insured savings and loans. By mid-May approximately $630 million had been withdrawn from MSSIC members in a three-month period.

Between May 17 and 28, 1985, an extraordinary session of the Maryland General Assembly was held to respond to the crisis. One of the problems to be confronted was the MSSIC insolvency. The then Maryland law required state chartered associations to have their accounts insured either by FSLIC or by MSSIC, but because of the crisis solvent associations which were MSSIC members were not meaningfully insured. Public confidence in the state chartered savings and loan industry would be further shaken if MSSIC were placed in a liquidating receivership as had been done in 1960 with Security Financial Insurance Corporation when account insurance was not a state requirement. Public confidence would also be shaken if the requirement for insurance of accounts of state chartered associations were

eliminated. The policy decision of the executive and legislative branches was that solvent state associations would have to obtain federal insurance in order to continue to operate as a savings and loan. It was also recognized that this could not be done immediately. It was decided that the State would take over MSSIC under statutorily defined circumstances. In this way continuity of insurance for associations which were not federally insured could be maintained for a limited time, and MSSIC could in effect be liquidated in an orderly manner while its members had the opportunity to procure federal insurance.

The legal mechanism effecting these objectives was the special statutory merger of MSSIC into MDIF. Chapter 6 of the Acts of the First Special Session of 1985, effective June 1, 1985, created MDIF, a nonstock, nonprofit corporation and a State agency within the Department of Licensing and Regulation. Chapter 6 repealed FI Title 10 (MSSIC) and enacted a new title, codified as Md.Code (1980, 1985 Cum.Supp.), Title 10 (MDIF) of the Financial Institutions Article (FI Supp.).

The merger of MSSIC into MDIF was effected specifically by uncodified § 4 of Ch. 6. That section further provided that

all of the assets, including but not limited to capital deposits, reserves, and other tax attributes, all of the liabilities, including but not limited to taxes, incurred losses, and other insurance liabilities, and all of the rights, powers, duties, obligations, and functions of [MSSIC] are hereby transferred to [MDIF], *to the extent consistent with this Act....* [Emphasis added.]

Uncodified § 5 of Ch. 6 mandated that all MSSIC members "immediately prior to the enactment of this Act shall automatically become members of [MDIF] on the effective date of this Act."

The "moneys" of MSSIC are required to be "maintained in a special nonlapsing fund, to be called the 'Maryland Deposit Insurance Fund.'" Purposes of that fund are:

insuring savings accounts of member associations; purchasing capital instruments issued by members to enable them to qualify for federal insurance on accounts; reimbursing savings account holders for loss incurred upon liquidation up to the amount of insurance; providing funds for liquidity and assisting in other specified ways in an emergency affecting a member; making capital contributions, under certain circumstances, to an entity acquiring a member association; and paying the net insured amount of accounts to receivers of members on final distribution. FI Supp. § 10–110(a) as amended by Chs. 3 and 4 of the Second Special Session of 1985, both effective October 25, 1985. FI Supp. § 10–116 declares it to be "the policy of this State that funds will be appropriated to the Fund to the extent necessary to protect holders of savings accounts in member associations." Pursuant to FI Supp. § 10–112(b) the CRF assets "shall continue to be segregated and maintained by the Fund to provide liquidity and are not subject to any insurance claim."

FI Supp. §§ 10–117 and 10–118 impose limits on membership in MDIF. In general, an association with total assets of $40 million or more could remain a member for not more than seven months after June 1, 1985, if it had applied for federal insurance on or before June 1, 1985. FI Supp. § 10–117(b)(1)(i). An association having total assets of at least $15 million but less than $40 million may not be a member on or after July 1, 1987. FI Supp. § 10–118(a)(1). An association having total assets of less than $15 million may not be a member on or after July 1, 1989. FI Supp. § 10–118(a)(2). MDIF insurance continues in effect for associations in receivership or in certain conservatorships. FI Supp. § 10–118(b).

The MDIF board of directors, consisting of eleven persons, six appointed by the Governor and five elected by members, subject to the approval of the Secretary of Licensing and Regulation, can adopt bylaws and rules and regulations for the fund. FI Supp. § 10–103. The Fund

Director, subject to approval of the board, can also adopt rules and regulations. FI Supp. § 10–113.

FI Supp. § 10–112(b) addresses the rights of withdrawing members from MDIF. It reads:

> *Subject to the terms and conditions adopted by the Fund Director and approved by the Board,* a member association may withdraw at any time from the Fund and have returned all or part of any capital advanced to [MSSIC] and all or part of any capital deposit required for membership in the Fund. All moneys and other assets of the former [MSSIC] central reserve fund shall continue to be segregated and maintained by the Fund to provide liquidity and are not subject to any insurance claim. [Emphasis added.[5]]

The balance sheet for MDIF as of May 18, 1985, the date of its creation, carried an allowance for estimated insurance losses of $325,100,000. Capital deposits to the insurance fund of $144,223,900, liabilities and the estimated insurance losses exceeded assets by $305,985,874. On that date the assets segregated to CRF were $89,847,878. CRF liabilities consisted of $985,878 in accrued interest payable and $88,-862,000 of capital notes. However, $67,341,447 of CRF assets had been pledged by MSSIC as collateral to enable Old Court to borrow from the Federal Reserve Bank in order to meet the run. Of the remaining, unencumbered CRF assets more that $19 million consisted of notes receivable evidencing loans made in May 1985 to Merritt and to First Maryland Savings and Loan Association. The latter association was placed in conservatorship on November 20, 1985. Consequently it appears that approximately $2 to $2.5 million was the maximum amount of CRF assets which

---

**5.** This section was enacted by Chs. 6 and 9 of the First Special Session of 1985. Both bills were emergency measures, effective from their respective dates of passage. Chapter 6 was approved May 18, 1985. Chapter 9 was effective May 21, 1985. Among other changes it added the last sentence to FI Supp. § 10–112(b). As we shall see that was one day before Chevy Chase obtained insurance through FSLIC.

could have been both unencumbered and invested in a solvent entity at the end of the spring of 1985.

As of June 30, 1985, MDIF had a negative net worth of $303,927,526 primarily due to estimated insurance losses of $325,100,000.

At the meeting of the MDIF board held on October 24, 1985, the directors reviewed the status of the CRF.

> The liquidity fund has been utilized for liquidity loans to member institutions as the crisis developed last May and through this summer. There was nothing in the MSSIC By-Laws to account for the type of crisis which we are presently experiencing. Due to this crisis, we ended up with major borrowing needs. About $51 million worth of securities from the liquidity fund have been pledged at the Federal Reserve Bank for our institutions. We have loaned $37,969,000. We have a total of $90 million in the liquidity fund and have available cash of $739,000. The rest of the assets are encumbered assets of the liquidity fund.[6]

At that meeting the MDIF board adopted resolution 85–1, which reads:

A. Because of the extent of currently anticipated losses, MDIF will not return capital deposits in the insurance fund to withdrawing members until the amount of currently anticipated losses is determined.

B. Because of the current illiquid state of the central reserve fund, the consideration of member contributions as assets by [FSLIC] and the payment of interest to members on the contributions, MDIF will not return contributions to withdrawing members before it has determined that there will be no loss to the fund in liquidating its assets and that the contribu-

---

6. On November 10, 1985, Chase Manhattan Corporation which had acquired Merritt and two other troubled savings and loan associations repaid MDIF $58.1 million of outstanding loans. The record before us does not make clear whether "cash" in the CRF was affected in any way at all by this payment.

tions will not be needed to assist members who are experiencing liquidity problems.

On January 10, 1986, the State Administration presented its plan for financing troubled savings and loan associations and for making depositors' funds more available. The plan contemplated using $80 million in then existing MDIF liquid assets from the insurance fund. The plan does not call for using any CRF assets. In addition, the State budget as adopted for fiscal 1987 contains an appropriation to MDIF of $92,416,480 for the central reserve fund. The explanation accompanying the budget is that MDIF "[m]ember deposits [to CRF] will be refunded by December 31, 1986." [7]

### Chevy Chase

Chevy Chase is the state chartered association with the greatest assets. As a MSSIC·member for over fifteen years, Plaintiff had been required to contribute nearly $39 million to the insurance fund and nearly $43 million to the CRF. In August of 1984 Chevy Chase had applied for membership in FSLIC, and by letter of October 12, 1984, Chevy Chase had notified MSSIC of Chevy Chase's intention to withdraw as a member of MSSIC on the effective date of FSLIC's approval of that application. On May 22, 1985, FSLIC approved insuring Chevy Chase accounts. On May 24, Chevy Chase notified its depositors that MSSIC insurance had terminated May 23 and that their accounts were federally insured.

By letter of May 28, Chevy Chase made demand on MDIF for immediate repayment of $21,630,106.85 from the insurance fund, representing the net after offsetting from Plaintiff's contributions to the insurance fund certain debts admittedly owed by Plaintiff to MSSIC. Plaintiff also demanded immediate repayment of $42,970,900, with interest

---

7. The date of December 31, 1986, had also been used in the October 10, 1985, agreement between MDIF and the Chase Manhattan Corporation as the outside date by which the entire amount of CRF contributions by the three associations involved in that transaction would be released by MDIF to the acquirer.

from April 1, 1985, representing its CRF contributions. Responding on June 13, 1985, MDIF took the position "that the Insurance Fund will be maintained to fulfill its purpose of insuring depositors against loss on their accounts" and that "[d]ue to the lack of liquidity of the Central Reserve Fund, there is presently no procedure to refund these monies to associations receiving federal insurance," but that the latter issue would "be resolved by MDIF at the appropriate time."

### Litigation and Issues

The instant suit was filed on October 17, 1985, in the Circuit Court for Baltimore City. In Count I, Plaintiff complained that the State and MDIF had breached the contracts relating to the repayments of insurance and of CRF contributions which had been formed between Plaintiff and MSSIC, the obligations of which had been assumed by MDIF. In Count II, Chevy Chase asserted that any abrogation of or change made in those contracts by the 1985 special session legislation was unconstitutional as an uncompensated taking of property.[8] Chevy Chase requested relief by way of damages, an injunction against expenditures, a declaratory judgment, and mandamus.

After the Administration's Plan of January 10, 1986, was announced, Chevy Chase moved in the instant case for an interlocutory injunction. It alleged that its contributions to the insurance fund were to be used as part of the $80 million contribution from MDIF to the plan. It further alleged that the remaining requirements of the plan would cause MDIF to invade, and perhaps totally deplete, assets available in the CRF. Chevy Chase asked that MDIF be required to segregate the Chevy Chase contributions to the insurance fund and that MDIF be enjoined from expending,

---

**8.** A third count asserted a separate claim based on the status of Chevy Chase as a member of a nonstock corporation and complained of mismanagement of corporate affairs. That claim is not before us. It was not decided by the trial court which has certified the matter to us pursuant to Maryland Rule 2–602(b).

or committing to expend, insurance fund monies which would cause that fund to drop below an amount needed to return in full Chevy Chase's contributions to the insurance fund. Plaintiff further asked for an injunction against any expenditures from the CRF until MDIF had escrowed an amount sufficient to repay Plaintiff's loans to the CRF.

The request for an interlocutory injunction produced cross-motions for summary judgment on the claims in Counts I and II. The circuit court decided the matter on those motions. It principally held that:

(1) "Chevy Chase is not entitled to a return of its Insurance Fund contributions unless money remains in the Fund after losses are paid"; and

(2) "Chevy Chase is entitled to a return of its Central Reserve Fund contributions when the liquidity problems of member associations are resolved"; and

(3) "[N]o unconstitutional taking of Chevy Chase's assets has occurred."

We agree. The circuit court also held that "the doctrine of sovereign immunity is a bar to Chevy Chase's contract claims in this case[.]" In view of our analysis, explicated below, we do not express any opinion on the defense of sovereign immunity asserted by the defendants.

Cross-appeals were taken from the circuit court judgment.[9] We issued the writ of certiorari prior to consideration of the matter by the Court of Special Appeals. The arguments will be considered separately as to each fund.

### Insurance Fund

■ Chevy Chase claims repayment of its contributions to the insurance fund with priority over the claims of depositors in MDIF member associations which have defaulted in

---

**9.** While the State and MDIF have labeled themselves as cross-appellants, we cannot discern any argument by the "cross-appellants" directed toward establishing an error in the declaratory judgment entered below. Those aspects of the judgment appealed from which denied the relief requested by Chevy Chase were wholly favorable to the defendants.

honoring depositor withdrawals. The argument is that the rules of MSSIC gave rise to a contract between Plaintiff and MSSIC. No party to this case argues that there is any difference, material to the outcome here, between corporate bylaws and what MSSIC labeled as rules. Corporate by-laws, particularly those of a mutual insurer, form part of the contract between the corporation and its policyholders or members. *See Condon v. Mutual Reserve Fund Life Association,* 89 Md. 99, 123, 42 A. 944, 950 (1889); *John C. Grafflin Co. v. Woodside,* 87 Md. 146, 39 A. 413 (1898); *Mutual Fire Insurance Co. v. Miller Lodge, I.O.O.F.,* 58 Md. 463 (1882); and *Anne Arundel General Hospital v. O'Brien,* 49 Md.App. 362, 432 A.2d 483 (1981). Another premise of the argument is that MDIF and the State are obliged to perform the contract made by MSSIC. We shall assume that is correct.

Plaintiff suggests that it acquired a "vested right" to its insurance contributions as of October 12, 1984, when it gave MSSIC notice of its intention to withdraw from MSSIC membership. That notice by its terms was only to be effective upon Chevy Chase's qualifying for federal insurance. Further, MSSIC Rule § 3–503 limited a withdrawing member's first payment from the insurance fund to a *pro rata* share of the cash in the insurance fund as of the "terminal date" which was the date as of which MSSIC insurance terminated. The terminal date was to be specified by MSSIC, but it could be no later than twelve months after a member's written notice of intent to withdraw. There is no evidence that MSSIC or MDIF ever specified a terminal date for Chevy Chase; thus the terminal date in this case would seem to be October 13, 1985. In any event, no assets could be withdrawn by Chevy Chase until it had delivered to MSSIC proof of notice to the depositors of the termination of MSSIC insurance, as required by Rule § 3–504. Plaintiff gave that notice on May 23, 1985. Consequently, MSSIC had not been required to pay anything out of the insurance fund to Chevy Chase as of May 18, 1985, when Ch. 6 became effective. As of May 18, 1985,

Chevy Chase had not withdrawn from MSSIC. On that date it remained a member of the nonstock corporation. *See Coltrane v. Blake,* 113 F. 785, 790 (4th Cir.1902), *aff'g Coltrane v. Baltimore Building and Loan Association,* 110 F. 272 (C.C.Md.1901) (attempted withdrawal by shareholder not effected before corporate insolvency).

Principally, Chevy Chase contends that it has priority over depositors' claims to the insurance fund because its claim is payable earlier. Under the MSSIC bylaws, §§ 2–704 and 2–705, MSSIC had no obligation to pay depositors' claims until the "net insurable loss" of each free share account of a member in default had been determined. The bylaws contemplated determining net insurable loss after a sale of the assets of the MSSIC member in default had established the liquidating value of the assets. Chevy Chase says that monies became unconditionally payable to it by MDIF out of cash in the insurance fund on May 24, 1985, that participating certificates which should have been issued to it then would have been payable as the insurance fund assets were liquidated, and that the remaining assets in the insurance fund would not become payable to depositors until their net insurable losses on accounts at defaulting MDIF member associations were determined.

This argument ignores the fact that MSSIC had always established reserves for insurance losses and that the reserves for losses resulting from the 1985 run on certain MSSIC members had left MSSIC insolvent. Even though the depositors' claims were not liquidated and were not required to be paid on May 18, 1985, they were then fixed as to liability and they were substantial in amount. 2A *Couch on Insurance* 2d (rev. ed. 1984) § 22:74, at 679 states:

> When a loss covered by the policy is sustained, the liability of the insurer is determined as of the date of the loss and according to the terms of the policy without regard to the fact that the insurer thereafter became insolvent or that the actual amount of the insured's claim

was not determined until after the insurer had become insolvent. [Footnote omitted.]

The defaulting members' depositors were creditors of MSSIC as of May 18, 1985.[10]

■ Because MSSIC was insolvent on May 18, 1985, and because the special statutory merger of that date was in part a technique for liquidating MSSIC, the priority claimed by Chevy Chase over the depositors as creditors should be tested by the law relating to insolvents. In insolvency distributions creditors have priority over shareholders. Applicability of this general principle to the facts here can be demonstrated by a number of analogies.

■ The ordinary rule applicable to a nonstock corporation such as MSSIC is that the provisions of Md.Code (1975, 1985 Repl.Vol.), Corporations and Associations Article (C & A), Titles 2 and 3, governing corporations in general also govern nonstock corporations. *See* C & A § 5–201; *Carter v. Glen Burnie Volunteer Fire Co.*, 292 Md. 165, 438 A.2d 278 (1981). Here the members of MSSIC are analogous to shareholders in an ordinary business corporation. The contributions to its capital which are required by MSSIC's rules in order to operate the insurance fund and which are refundable to a member who has withdrawn are analogous to redeemable stock in an ordinary business corporation. C & A § 2–311 prohibits a Maryland corporation from purchasing or redeeming "any of its stock if the corporation is insolvent or the transaction would cause the corporation to become insolvent." By a parity of reasoning, Chevy Chase's contributions to the insurance fund were not repayable by MSSIC after the latter became insolvent.

■ Inasmuch as MSSIC was insolvent before Chevy Chase satisfied the conditions for withdrawal from member-

---

**10.** The description of depositors or holders of free share accounts as "creditors" of the insurer refers to their interest in the insurance proceeds. We are not here concerned with who might be a proper party plaintiff to assert a claim against MDIF for insurance proceeds.

ship, Chevy Chase's demand for payment when it had satisfied those conditions did not convert Chevy Chase into a creditor, much less a creditor who enjoyed a priority in payment over insured depositors. Illustrative are the cases in which policyholders in *mutual* insurance companies or members of fraternal benefit societies seek death benefits or endowment payments from an insolvent insurer. These cases make a distinction based on whether the event which satisfies the policy condition for payment occurred before or after the mutual insurer became insolvent. The common law rule is that unless the policy "matured," *i.e.,* the right to benefits became fixed, before the insolvency, the claimant does not become a creditor who is to be paid in full before payment of other certificates maturing after insolvency or of certificates which have not matured. *See Failey v. Fee,* 83 Md. 83, 95–96, 34 A. 839, 842 (1896); *Baltimore & Ohio Railroad Co. v. Baltimore & Ohio Employees' Relief Association,* 77 Md. 566, 573, 26 A. 1045, 1047–48 (1893). *See also Gilbert v. Washington Beneficial Endowment Association,* 21 App.D.C. 344 (1903); *In re Educational Endowment Association,* 56 Minn. 171, 57 N.W. 463 (1894); *Vanatta v. New Jersey Mutual Life Insurance Co.,* 31 N.J.Eq. 15 (1879); *Hagerling v. Pension Mutual Life Insurance Co.,* 68 Pa.Super. 170 (1917); *In re Advance Beneficial Order's Assigned Estate,* 48 Pa.Super. 197 (1911); 2A *Couch, supra,* § 22:73. The rationale of these cases is well expressed in *Mayer v. Attorney General,* 32 N.J.Eq. 815, 820 (1880) which this Court cited favorably in *Failey, supra,* 83 Md. at 96, 34 A. at 842. The New Jersey court said:

I agree with the chancellor in thinking that claims founded on policies that matured before insolvency, should be preferred to claims simply for reserves. This conclusion is clearly required, I think, in a mutual company, by the difference between the character of a matured claim and the character of a policy reserve. It is in substance the difference between the claim of an outside creditor against a firm for a debt, and a claim of a member of the firm for his share of the assets invested in

its business. It is true that the company, in this case, was not an ordinary partnership. It was a corporate body whose members were changing, and their liability for the company's losses was of limited extent; but as between the parties whose claims are now under consideration, the relation which the owner of a matured claim held to the corporation and to the remaining members, was, to the extent of the company's assets, the relation of an outside creditor to the partners of a firm. As partners can claim no part of the partnership assets on a settlement till the partnership debts have been paid, so here those who were members of the company when insolvency occurred, must be postponed to those who had previously become creditors, and ceased to be members. This results from the manner in which the company was organized and its business conducted.

The rule is the same in the field of savings and loan corporations. *Wyman v. McKeever*, 239 Md. 130, 210 A.2d 537 (1965) involved such a corporation which had been placed in receivership. Prior to the order for receivership, but while the corporation was in fact insolvent, various free shareholders had presented withdrawal requests and had received checks which were dishonored on presentment. Judge Hammond, writing for the Court, rejected the contention that those account holders were to be treated as creditors in the distribution and said:

> The general rule, now firmly established by the great majority of the cases on the subject, is that after a building association has become insolvent in fact, even though this is not known, the right of every shareholder to equality in the distribution attaches as a paramount equity and no shareholder has the right to defeat that equality by withdrawing, perfecting an incompleted attempt to withdraw, or retaining the fruits of a completed withdrawal. Sundheim, [*Building and Loan Associations* (3d ed. 1933)], Sec. 158 says:

. . . . .

... "The right of withdrawal, which is a peculiar feature of building and loan associations, is not given to the member for the purpose of enabling him to evade his just share of the losses incurred by an insolvent association." [*Id.* at 133, 210 A.2d at 539.]

In the matter *sub judice* Chevy Chase is in effect reading in a vacuum MSSIC Rule § 3–503 concerning withdrawing members' obtaining return of insurance fund contributions. The rule is subject to an implied condition that MSSIC is solvent. This equitable rule of construction is illustrated by *Lacy v. State Banking Board*, 118 Tex. 91, 11 S.W.2d 496 (1928) (Tex.Comm'n App. opinion adopted). Depositors in bank A which had failed on September 29, 1926, made claim against the guaranty fund for state banks administered by the banking commissioner. Their claims were ultimately approved. In the period between October 31, 1926, and January 7, 1927, banks B through I also failed, causing the guaranty fund to become insolvent to a degree beyond cure by assessments on other member banks which had not failed. Statutes governing the guaranty fund provided that "[i]f the Commissioner takes possession of any bank" its depositors should first be paid out of cash on hand in the insolvent bank "and if not sufficient, the remainder shall be paid out of the Depositors' Guaranty Fund through the banking board." The claimants contended that their right to payment from the fund became vested when the commissioner took possession of bank A and that priority in time of accrual of the right to payment governed fund distribution. The Supreme Court of Texas rejected that argument by reasoning that

[t]he provision that the remainder due to depositors shall be paid out of the depositors' guaranty fund through the banking board, of course means in the regular and orderly method of administering the law. This contemplated solvency, an ample reserve fund, and a liberal power of assessment of member banks. But, when the machinery by which these affairs are administered have broken down, the plan made impossible of further execution, the

available fund wholly insolvent, and the law creating the scheme itself repealed, that orderly process of payment is no longer practicable or even possible, according to the original contemplated means and method of performance, but rather is controlled by the principles of equity applicable to trust funds and administrations generally. [*Id.* at 103–04, 11 S.W.2d at 502.]

Chevy Chase relies heavily on *Ruden v. Ruden,* 60 S.D. 447, 244 N.W. 775 (1932) to support its asserted priority over creditors. That case is distinguishable from the one at hand.

*Ruden's* facts were that in 1922 corporation A, a bank, had failed. Corporation B was organized as a bank using the same name as A. B and the South Dakota Bank Guaranty Fund agreed that B would honor the withdrawal demands of A's depositors, that B would reimburse itself first from the assets of A, and then, to the extent of any deficiency, the fund would reimburse B in cash. The fund disputed B's claim to reimbursement at a time when the fund was able to pay B's claim in full. That dispute was ultimately resolved by a 1930 judgment in B's favor. In the meanwhile a series of bank failures beginning in 1923 had caused the fund's liabilities to exceed its assets by 35 to 1. The fund had been issuing certificates of indebtedness to depositors of failed banks in anticipation of acquiring additional resources through assessments. In 1925 the South Dakota legislature enacted that money in the guaranty fund should be distributed by pro rating the same upon outstanding certificates of indebtedness in proportion to the unpaid principal amounts thereof after crediting proceeds of liquidation of the individual banks without priority by reason of due date. B claimed priority over holders of fund certificates and the court agreed, reasoning that "[b]ank depositor claimants have no right to demand or expect that money which [B] advanced to the guaranty fund, and which should and could have been repaid, and was not, should be distributed to them." *Id.* at 454, 244 N.W. at 778–79.

In the *Ruden* case the monies claimed by B were not capital contributions made by B as a fund member. The monies claimed were advanced by B in lieu of payment by the fund directly to depositors and were used for the purpose of the fund in making depositors whole. Chevy Chase's contributions to the MSSIC insurance fund were likewise for the purpose of paying depositors' losses in failed member associations. Depositors in failed MSSIC insured associations have a right to expect that contributions by MSSIC members to the insurance fund will be applied to depositors' claims. But if Chevy Chase may presently withdraw its insurance contributions, in full, without regard to depositors' claims, the statutory purposes of the insurance fund will be defeated.

The circuit court was correct when it declared that Chevy Chase was "not entitled to a return of its Insurance Fund contributions unless money remains in the Fund after losses are paid[.]" Inasmuch as there has been no breach of contract by not refunding insurance fund contributions, relief for that claimed breach of contract was properly denied.

Central Reserve Fund

The circuit court held that "Chevy Chase is entitled to a return of its Central Reserve Fund contributions when the liquidity problems of member associations are resolved[.]" The State does not dispute this conclusion so that we are not concerned with whether the contributions are refundable. The issue on this phase of the case is whether the delay in payment constitutes a taking of Chevy Chase's property.

■ The terms of the contract with MSSIC on which Plaintiff rests this claim are found in MSSIC Rule § 3–901. Subsection (B)(6) of that rule states that "[m]embership in the [CRF] may be terminated should any member withdraw from membership in the Corporation[.]" It provides that "[i]n the event of such termination, whether as a result of withdrawal or expulsion ... payment shall be made of the

investment in said [capital] notes," and sets forth a notice requirement which is incorporated into subsection (K) of the rule. We shall assume that the required notice had been given. Subsection (K) then provides that a withdrawing member

> shall be entitled to receive the face amount of the capital notes within six months after notice of its intention to withdraw; in the event the Central Reserve Fund does not have sufficient cash available to pay the withdrawing member the full amount of the capital note, then, in that event, the Fund may make partial payments of funds received from maturing securities to the withdrawing member until the full amount due the member is paid.

Chevy Chase suggests that all of its CRF contributions became immediately payable on April 13, 1985, six months after Plaintiff's October 12, 1984, notice of intention to withdraw from membership in MSSIC. But, because under subsection (B)(6) membership in MSSIC must first have been terminated before membership in the CRF could have been terminated, Chevy Chase had no right to immediate payment of CRF contributions prior to its effective withdrawal from membership in MSSIC. As we have seen, the earliest date on which that withdrawal could have been effective was May 24, 1985. Indeed, in its motion for summary judgment Chevy Chase took the position that its right to repayment of CRF funds became unconditional on May 24, 1985.

Rule § 3–901(K) bristles with questions of interpretation superimposed on questions of fact.[11] Nevertheless, we

---

11. If the CRF does not have "sufficient cash available," does that operate to extend time for payment? For how long? Do investments maturing after notice and before withdrawal qualify as "cash," or may they be reinvested in ordinary course? Is the condition that the CRF have "sufficient cash available" satisfied if the "cash" equals or exceeds the "face amount of the capital notes," or does the concept, "sufficient cash available," exclude from the sum to be paid to a withdrawing member the amount of "cash" which should be maintained on hand in order to meet reasonably anticipated liquidity requirements of the remaining members? Who makes the judgment

shall assume, *arguendo,* the interpretation of Rule § 3–901(K) most favorable to Chevy Chase. That is to say, we shall assume that, but for Ch. 6, Chevy Chase would have been entitled to all of its contributions to the CRF as of May 24, 1985, without regard to the liquidity requirements of MDIF's members.[12]

Chapter 6, effective May 18, 1985, changed that assumed contract. Under § 4 of Ch. 6, MDIF assumed MSSIC's obligations, including executory contracts, only to the extent that a given obligation was consistent with Ch. 6. That enactment also provided in FI Supp. § 10–112(b) that members' withdrawals of capital advanced to MSSIC, *i.e.,* CRF funds, would be subject to the terms and conditions adopted by the Fund Director and approved by the board. Instead of a withdrawing member having an unqualified right of withdrawal of CRF funds, as claimed by Plaintiff, the General Assembly in Ch. 6 essentially rejected MSSIC Rule § 3–901 and delegated the responsibility of determining the conditions of withdrawal to MDIF's director and board.

The acting Fund Director on June 13, 1985, refused Chevy Chase's request for its CRF contributions "[d]ue to the lack of liquidity of the Central Reserve Fund[.]" There is no evidence or contention that that position was disap-

___

whether sufficient cash is available? Is that judgment subject to judicial review? If so, by what standard?

**12.** By assuming Chevy Chase's construction of the MSSIC rule we do not violate the principle of judicial process under which a court ordinarily does not decide a constitutional question if the matter may be decided without reaching the constitutional issues. On the record presented for summary judgment, the circuit court did not decide whether under MSSIC Rule § 3–901 there was any breach of contract. The trial judge denied Chevy Chase's "contract claims" by holding that the State and MDIF enjoyed sovereign immunity. It then held that there had been no taking effected by Ch. 6. Any analysis of the sovereign immunity defense under the circumstances of this case would in any event require us to consider the unconstitutional taking argument raised by Chevy Chase. By assuming that the State has unilaterally changed the contract as to CRF funds, we are simply using an express train to get to the same ultimate destination without local stops.

proved by the MDIF board, if the board had even been constituted by that date. The board's resolution of October 24, 1985, affirmatively approved the Director's position. The board concluded that MDIF would not return contributions to withdrawing members "before it has determined that there will be no loss to the [CRF] in liquidating its assets and that the contributions will not be needed to assist members who are experiencing liquidity problems." That resolution gave as one reason the "current illiquid state of the [CRF]."

We need not here decide on the legal theory underlying the statutory merger's treatment of MSSIC rules generally. In an ordinary merger under the general corporation law the separate existence of each party to the merger, except the survivor, ceases. C & A § 3–114(b). Because the corporate life of MSSIC was extinguished by merger, the MSSIC bylaws and rules would have been extinguished as well. On that analysis, the Director and MDIF board adopted a new rule different from the earlier extinguished rule on which Plaintiff's contract with MSSIC had been formed. On the other hand, the special statutory merger effected by Ch. 6 might be construed as not having extinguished all the MSSIC rules but to have transferred them to MDIF except to the extent contrary to Ch. 6. Under that analysis, the conflict between Ch. 6 and MSSIC Rule § 3–901 prevented Rule § 3–901 from being adopted by MDIF as part of the merger. In either event, Plaintiff's position is that its contract, even if executory at the time of the change, was constitutionally protected and that the change, whereby liquidity needs are considered before CRF contributions are repaid, is a taking of Plaintiff's property.

After the circuit court filed its opinion in this case, the budget bill for fiscal 1987 was enacted and it appropriated funds to the CRF which will be available as of July 1, 1986. That enactment fixes December 31, 1986, as the outside date for repayment to MDIF members of their CRF contributions. Further, following the creation of MDIF, members' contributions to the CRF have continued to carry

interest. There is no contention in this case that the rate of interest MDIF pays is a factor indicating a taking has occurred. Consequently, the issue is whether the State has taken Chevy Chase's property by delaying return of its CRF contributions from May 24, 1985, to as late as December 31, 1986, while paying adequate interest on the funds in the interim.

Although the United States Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment," it has identified "three factors which have 'particular significance:' (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly v. Pension Benefit Guaranty Corp.*, —— U.S. ——, ——, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166, 178–79 (1986) (quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978)). The Multiemployer Pension Plan Amendments Act of 1980 imposed a liability on an employer withdrawing from such a plan to pay into the plan an amount proportionate to the employer's share of the plan's unfunded vested benefits. *Connolly* held that there was no taking despite the fact that under the contract between the plan and employers a withdrawing employer had no such obligation.

In the case before us it should first be noted that MSSIC was a form of guaranty fund for state chartered savings and loan deposits. Since 1973, a corporation which desired to conduct a savings and loan business in Maryland and which chose not to, or could not, qualify for federal insurance was obliged to become a member of MSSIC. It has long been settled that a state constitutionally exercises its sovereignty by requiring financial institutions to contribute to a guaranty fund for the protection of depositors. *See Noble State Bank v. Haskell*, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112 (1911). And *see Assaria State Bank v. Dolley*, 219 U.S. 121, 31 S.Ct. 189, 55 L.Ed. 123 (1911). In addition,

although a private corporation, MSSIC was chartered by special legislative act, and its charter could be changed by further legislative act without regard to the votes of MSSIC's members, subject only to constitutional limitations. Consequently, Chevy Chase's contract with MSSIC, when made, dealt with a regulated subject matter on which the State could act at any time in the future for the general welfare. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132, 138 (1958). Chevy Chase's contract with MSSIC did not enjoy a high expectation of immutability.

Next, we observe that the nature of the change effected by Ch. 6 is not very substantial. MSSIC's CRF was always intended to assist members with liquidity. Chevy Chase's entire legal position rests on the fact that MSSIC Rule § 3–901 does not expressly condition the corporation's obligation to repay withdrawing members their CRF contributions on the availability of funds over the corporation's reasonably anticipated needs for liquidity. The change which we assume to have been effected by Ch. 6 is express on that score, but there is no change in the purpose for which the funds are being used as a result of the "change" in the rule. *See Connolly, supra*, —— U.S. at ——, 106 S.Ct. at 1027, 89 L.Ed.2d at 180 ("Prudent employers [in 1980] had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations.").

Nor does the degree of intrusion on Chevy Chase's right to receive repayment even approach the line separating a constitutional exercise of sovereignty from an unconstitutional taking. We have said that "[f]or government restriction upon the use of property to constitute a taking in the constitutional sense, so that compensation must be paid, the restriction must be such that it essentially deprives the owner of all beneficial uses of his property." *Governor v. Exxon Corp.*, 279 Md. 410, 436–37, 370 A.2d 1102, 1117

(1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Here, of course, compensation for the use of the money is being paid and at a rate which is unchallenged. Economic burdens far exceeding that which Ch. 6 and the implementing decision of MDIF's Director and board have placed on Chevy Chase have been held constitutional. For example, when California instituted an assigned risk plan for automobile liability insurance the plan was challenged by an insurer which had written only select risks at a lower cost than the prevailing rate. The fact that the complainant's business might be less prosperous as a result of the regulation did not amount to a taking in the constitutional sense. *See California State Automobile Association Inter-Insurance Bureau v. Maloney,* 341 U.S. 105, 71 S.Ct. 601, 95 L.Ed. 788 (1951). That the Maryland General Assembly chose not to make MSSIC subject to the jurisdiction of the Insurance Commissioner of Maryland does not detract from the reasoning of the Supreme Court in the California assigned risk case.

The case in its broadest reach is one in which the state requires in the public interest each member of a business to assume a *pro rata* share of a burden which modern conditions have made incident to the business. It is therefore not unlike *Noble State Bank v. Haskell,* 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, which sustained a state law assessing each state bank for the creation of a depositors' guaranty fund. What was there said about the police power—that it "extends to all the great public needs" and may be utilized in aid of what the legislative judgment deems necessary to the public welfare, 219 U.S. at page 111, 31 S.Ct. at page 188—is peculiarly apt when the business of insurance is involved—a business to which the government has long had a "special relation." [*Id.* at 109, 71 S.Ct. at 603, 95 L.Ed. at 792 (footnote omitted).]

An enforced contribution for the common good was also involved in *Allied American Mutual Fire Insurance Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 150 A.2d 421 (1959). Under the Unsatisfied Claim and Judgment

Fund statutes, the board administering that fund was authorized to assign claims for investigation and defense to insurers in proportion to their respective Maryland premiums. The insurers were not reimbursed for the costs and expenses incurred in causing these services to be rendered. We held that the statutory imposition of those obligations was a constitutional exercise of the police power.

An additional factor which weighs very heavily in the constitutional evaluation is the economic emergency which resulted in the spring of 1985 from the savings and loan crisis and which produced Ch. 6 and the contract change complained of by Chevy Chase. The first special session of 1985 also enacted Ch. 4, authorizing the creation of $100 million of state debt for the Savings and Loan Association Capital Stabilization Fund. The preamble to Ch. 4 contains the following legislative findings of fact:

> Public confidence in the security of deposits in privately insured savings and loan associations has been severely eroded by recent events in Ohio; and
>
> ... The events in Ohio have led to heightened sensitivity in Maryland to the fiscal integrity and financial stability of privately insured savings and loan associations; and
>
> ... Two major State-chartered, privately insured savings and loan associations are under court ordered conservatorships; and
>
> ... These events and the consequent erosion of public confidence have led to the proclamation by the Governor of an emergency sufficiently grave to require his directing that withdrawals by depositors be limited to an aggregate $1,000 per account in each 30 consecutive day period commencing May 14, 1985, from any association insured by the Maryland Savings-Share Insurance Corporation not in conservatorship; and
>
> ... The General Assembly has been called into Special Session to take action to alleviate the impending financial crisis; and

... The continued fiscal integrity and financial stability of the thrift industry in Maryland is a vitally important concern to the State and all of its citizens; and

... The events in Maryland have been reported adversely to have affected the value of the United States dollar in international money markets; and

... Both the fiscal reputation of the government of the State of Maryland and the credit of the State of Maryland, including its ability in the future to finance vitally needed public projects and programs through ready access to the financial markets, may be adversely affected unless decisive action is taken to restore public confidence; and

... The General Assembly hereby declares that a condition of public crisis and emergency exists in the State of Maryland and that the following enactment is necessary to protect the public safety, health, and welfare, to control the state of emergency, and to restore public confidence in, and the fiscal integrity and financial stability of, the thrift industry throughout Maryland[.]

From the standpoint of an economic emergency the instant case is like *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). On April 18, 1933, Minnesota enacted its Mortgage Moratorium Law which permitted the extension of time for redemption by mortgagors of foreclosed property and granted the mortgagors the right to continue possession if they paid the foreclosing mortgagee the reasonable rental value of the property. *Blaisdell* involved a property which had gone to foreclosure sale on May 2, 1932, almost one year before the statute was enacted. A Minnesota court applied the statute to extend the mortgagor's redemption deadline and right of possession to May 1, 1935. The Supreme Court of the United States held there was no impairment of the mortgage contract. *See also Veix v. Sixth Ward Building & Loan Association,* 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940) (no impairment of contract of depositor suing in 1939 where a statute enacted in 1932 to regulate withdraw-

als from distressed savings and loan associations had continuously prevented the complainant from obtaining his deposit). Thus, the delay in the instant case in repaying the principal of Plaintiff's CRF funds which are earning interest during the period of the delay cannot be an unconstitutional taking.

■ In its brief in this Court, Chevy Chase argues that Ch. 6 unconstitutionally impaired the obligation of its contract. That ground of attack was not asserted in Chevy Chase's complaint and was not decided by the trial court. Even were it properly raised it has been answered adversely to Chevy Chase by the foregoing discussion. Under *Energy Reserves Group v. Kansas Power and Light Co.*, 459 U.S. 400, 411–13, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569, 580–81 (1983), an impairment analysis looks first to whether Ch. 6 in fact operated as a substantial impairment of a contractual relationship. Here Ch. 6 did not so operate. But even if it had, the State can justify the impairment by a significant and legitimate public purpose behind the regulation. Here that purpose is to quell further panic by preventing illiquidity in member associations not in conservatorship or receivership. Finally, the adjustment of the rights and responsibilities of the contracting parties must be based upon reasonable conditions and be of a character appropriate to the public purpose justifying the adoption of the legislation. Here in order to meet one aspect of the savings and loan emergency a delay of limited duration in refunding principal was imposed while paying adequate interest on the principal during the delay.

■ Throughout its arguments Chevy Chase has emphasized the retrospective nature of the contract change made by the State, as if retroactivity alone invalidated Ch. 6's regulation of capital withdrawals. Obviously all legislatively imposed changes in existing contracts involve some retroactivity, but all such changes are not unconstitutional. On this aspect Chevy Chase relies on *Vytar Associates v. City of Annapolis*, 301 Md. 558, 483 A.2d 1263 (1984).

There the plaintiffs had become entitled to refunds of license fees which had been invalidly imposed by a municipality when the General Assembly attempted retroactively to validate the impositions and to block the plaintiffs' refund claims. We held the refund claims were protected property rights. *Vytar* relied upon *Washington National Arena v. Prince George's County*, 287 Md. 38, 410 A.2d 1060, *cert. denied*, 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980). Both *Vytar* and *Washington National Arena* are examples of a line of cases which "have held that retroactive statutes, imposing taxes or other governmental charges and reaching voluntary transactions completed significantly before the enactment of the statutes, unconstitutionally deprive persons of property or contract rights." *Washington National Arena, supra,* 287 Md. at 45 n.3, 410 A.2d at 1064 n. 3. Even if MDIF's use of the CRF contributions could be viewed as the imposition of a governmental charge, Chevy Chase's transaction with MSSIC had not been completed when Ch. 6 was enacted. Chapter 6 made MSSIC Rule § 3–901 no longer applicable before Chevy Chase had withdrawn from MSSIC.

The circuit court correctly declared the rights of the parties as to the CRF funds.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY CHEVY CHASE SAVINGS AND LOAN, INC.

## APPENDIX

### MSSIC RULES AND REGULATIONS

Section 3–301. Total Capital Deposit. Each member shall contribute as a capital deposit with the Corporation a sum equal to 2 per cent of its free share accounts. All capital deposits made in accordance with this Rule and the certificates of deposit issued therefor shall be rounded off to the nearest hundred dollars.

Section 3–306. Certificates of Deposit. Certificates of deposit shall be issued by the Corporation to its members

for all capital deposits made with the Corporation in accordance with these Rules. Members may carry such certificates of deposit on their books as assets. No interest or dividends of any kind whatsoever shall be payable by the Corporation with respect to any certificate of deposit issued by it in accordance with these Rules.

Section 3–501. *Withdrawal.* Any member which is not, either at the time of giving notice of intention to withdraw or at the time of withdrawal, in default in any of its obligations to the Corporation, including calls made before the date of withdrawal, and which has repaid any advance or loan made to it by the Corporation and has carried out the terms of any other agreement made with the Corporation, may withdraw from membership in the Corporation upon giving to it twelve months notice in writing of its intention to withdraw.

Section 3–503. *Payment to Withdrawing Member.* Any member withdrawing from the Corporation pursuant to the provisions of this section of these Rules shall be entitled to receive from the Corporation payment of the certificate of deposit issued by the Corporation and owned by such member less any debts or obligations owed by such member to the Corporation (such amount being hereinafter referred to as the "net deposit") in the following manner:

(A) A date shall be specified by the Corporation for the termination of insurance of free share accounts issued by the withdrawing members, which date shall not be later than twelve months from the date of the notice referred to in Section 3–501 (such date being referred to in these Rules as the "terminal date").

(B) A fraction as of the terminal date shall be determined, the numerator thereof being the total cash owned by the Corporation and the denominator thereof being the total assets (including cash) of the Corporation. Such fraction shall then be applied to the net deposit of the withdrawing member, and there shall be determined thereby the amount of cash that will be delivered to the withdrawing member as

provided by the sub-sections of this Rule immediately following.

(C) The terminating member shall be entitled to receive its prorata share of the cash of the Corporation as determined by Section 3–503(B) on the terminal date.

(D) The terminating member shall be entitled to receive on the terminal date a certificate of fractional participation, such certificate to be in a face amount equal to the net deposit of the terminating member less the cash received by such member in accordance with Section 3–503(C).

(E) The certificate of fractional participation received by a terminating member in accordance with Section 3–503(D) shall entitle the holder thereof to its proportionate share of any proceeds resulting from the liquidation of such remaining assets as they are liquidated by the Corporation. Such certificate shall describe the assets to which it relates only by symbols, and the Corporation shall, after the issuance of such certificate, designate such assets on its records by like symbols. Such certificate shall not entitle the holder thereof to any control over the manner, amount or date of liquidation of such assets. The Corporation shall not reveal any information relative to such remaining assets other than the extent of liquidation of the assets to which such certificate relates. The Corporation in final settlement of a withdrawing member's net deposit may either pay to the withdrawing member in lieu of such certificate such sum in cash as may be agreed upon as the reasonable value thereof, or, at any time after the issuance of such certificate, may purchase the same for such sum in cash as may then be agreed upon as the reasonable value thereof.

Section 3–504. *Termination and Notice.* No free share account issued by any member shall be insured after the termination date as defined in Section 3–503(A). Any member whose membership in the Corporation is terminated at any time shall notify each of its free share holders of such termination of membership and shall set forth in the notice the termination date as defined in Section 3–503(A). In no

event shall the Corporation permit the withdrawal of any assets from the Corporation by any terminating member until such member has delivered to the Corporation proof of the giving of notice required by this section. In the event the withdrawing member fails to notify its free share holders of termination of insurance within sixty days of notification to the withdrawing member by the Corporation of the terminal date as provided in Section 3–503(A), the Corporation shall give such notice at the expense of the withdrawing member.

Section 3–901. The corporation and its members authorize the formation of a Central Reserve Fund to provide for the liquidity of member associations subject to the following provisions:

(A) Membership. Membership shall be mandatory for all members of the Corporation.

(B) Capital Funds.

(1) The capital of the fund shall be derived from the sale of capital notes to be divided into denominations of $100.00 each. The capital notes shall be issued at such price as may be fixed by the Board of Directors but in no event at less than $100.00 par.

(2) The subscription of each member institution shall be determined as follows:

(a) One-half of one per centum of the member's assets for associations having less than 75 million dollars ($75,000,000) in assets.

(b) One and one-half of one per centum of the member's assets for associations having 75 million dollars ($75,000,000) or more in assets.

(c) All subscriptions shall be rounded off to the nearest one hundred dollars ($100.00), but not less than one hundred dollars ($100.00).

(d) Payments for capital notes due from the members shall be made in four equal quarterly installments, the first installment being due and payable within 30 days after the date set by the Board of Directors.

(e) There shall be imposed a penalty for late payment of the purchase of capital notes or any adjustment thereon, after the expiration of five days from the due date thereof. The penalty shall be a sum equal to 10% per annum on the amount due computed for each day after the grace period has expired.

(f) Any member institution presently having assets of less than $75,000,000 shall, upon attaining assets of $75,000,000 or more on August 31st, purchase additional capital notes in the amount of 1% of assets, so that the member will have total purchase of 1½% of total assets; payment therefore to be made in four equal quarterly installments with the first installment being due and payable on September 30th.

(g) There shall be an adjustment of the subscription to capital notes required to be purchased by each member annually as of August 31st each year. The adjustment of the subscription as of August 31st of each year shall equal one-half of one percentum of the member's assets for associations having assets of less than 75 million dollars, and one and one-half percent of the member's assets for associations having assets of 75 million dollars or more. Payment for the additional subscription shall be made no later than September 30th of each year. In the event the required subscription of a member has de-

creased over the preceding annual period, it will receive a refund of such difference in cash not later than October 31st following the period for which the adjustment is made and the principal sum due and payable on the capital notes shall be reduced accordingly.

(3) Newly admitted members shall subscribe to capital notes in an amount in accordance with the formula set forth in 3–901(B)(2)(a–c) above. The determinative date for the computation being the date when the member becomes insured, and payment therefor shall be made in four equal quarterly installments the first installment being due and payable on the date the member becomes insured.

(4) The Fund shall have the power and authority to borrow such sums of money as the Board of Directors may determine. The Board of Directors may issue bonds, debentures, notes or other evidence of indebtedness, whether secured or unsecured, and pay such rate of interest on said borrowings as may be required.

(5) The capital notes subscribed for by the members, and the right to the proceeds therefor, shall not be transferred or hypothecated except as hereinafter provided.

(6) Membership in the Fund may be terminated should any member withdraw from membership in the Corporation or be expelled. Any withdrawing member shall notify the Fund of its intention to withdraw at least three (3) months prior to termination of its membership. In the event of such termination, whether as a result of withdrawal or expulsion, the capital notes shall be surrendered and cancelled and payment shall be made of the investment in said notes plus accrued interest, if any, less

any advances, loans or other indebtedness of the member, and the collateral, if any, shall be returned.

(7) A member may be permitted to dispose of its capital notes upon first securing the written approval of the Board of Directors.

(8) Interest shall be paid on all capital notes without preference.

NOTE: The Central Reserve Fund shall not be subject to payment of insurance claims against the Corporation by member associations, or their Free Share holders, or otherwise.

(C) Management of Fund. The Board of Directors of the Corporation, by resolution adopted by a majority of the whole Board of Directors, shall provide for a Central Reserve Fund Committee to manage the Fund. The Membership of the Committee shall consist of no less than five persons appointed by the President of MSSIC and approved by the Board, one of whom shall be designated as Chairman. The Executive Vice President shall serve as secretary thereof. The committeemen may or may not be Directors of the Corporation or members of the Corporation and may be public representatives provided, however, a majority of the Committee shall be members of the Board. Members of the Committee shall hold office until the next annual meeting following their appointment and until their successors are appointed and qualified. The Committee shall be charged with the management of the Fund and shall have the power and authority consistent with this Rule, to determine the procedures to be followed to implement the provisions of this Rule. The procedures adopted by the Committee shall be ratified by appropriate action of the Board of Directors of MSSIC prior to their use.

(D) Eligibility of Member. Any member of the Fund shall be entitled to apply for advances. The Committee, in its sound discretion, may determine whether or not such application need be in writing and prescribe the form there-

**424**

for. The Committee may at its discretion deny any such application or may grant it on such condition as the Committee may prescribe.

(E) Advances.

(1) The Committee is authorized to make advances to its members upon a secured or unsecured basis and shall have the right to determine in its sound discretion the conditions, limitations and restrictions, if any, imposed upon the member; providing, however, that such advances shall not be for a term of more than one year, without the prior approval of the Board.

(2) Notes of Borrowing Members—Interest Rate—Lien on Capital Notes. Such advances shall be made upon the note or obligation of the member secured as provided by this section, bearing such rate of interest as the Committee may approve or determine and the Board may have a lien upon and may hold the capital notes of such member as further collateral security for all indebtedness of the member to the Fund.

(3) Obligation to repay—Additional Security—Assignment of Advances to Others. The member applying for an advance shall enter into a primary and unconditional obligation to pay off all advances, together with interest and any unpaid costs and expenses in connection therewith according to the terms under which they were made, in such form as shall meet the requirements of the Fund. The Fund shall reserve the right to require at any time, when deemed necessary for its protection deposits of collateral security if the loan was originally an unsecured loan, or additional collateral security or substitution of security by the member, if the loan was originally secured. Each member shall assign collateral security or additional

substitute security by the Committee shall so do within seven days of the receipt of notice. Subject to the approval of the Board, the Fund may sell or assign to the State of Maryland, any agency or department thereof, or any financial institution, with or without recourse, any advance made under the provisions of these sections.

(F) Powers and Duties of the Fund

(1) The Fund shall have the power to borrow and give security therefor and to pay interest thereon, to issue debentures, bonds, or other obligations upon such terms and conditions as the Board may approve, and to do all things necessary for carrying out the provisions of these sections and all things incident thereto.

(2) Acceptance of Deposits—Restrictions on Fund. The Fund shall have power to accept deposits made by members of the Fund upon such terms and conditions as the Board may prescribe and to pay interest on said deposits.

(3) Investment of Surplus Funds. Such part of the assets of the Fund as are not required for advances to members may be invested for such period of time as the Committee, in its sound discretion, may determine.

(4) The Fund shall have the power to invest in, but not originate mortgages, securities issued by the United States Government and agencies thereof and any other investments approved by the Board of Directors, and may sell all or any part of said investments upon such terms and conditions as the Central Reserve Fund Committee may determine.

(G) Reserve and Interest.

    (1) The Fund shall retain such portion of its net earnings as the Board may determine for the purpose of establishing a Reserve for Losses.

    (2) Interest shall be paid on the capital notes, and the Committee shall, each 90 days, fix the rate of interest to be paid for the ensuing period.

(H) Liquidity. Any capital notes purchased by a member shall be part of the liquidity fund required to be maintained under Section 3–210; provided however, the borrowing member has fulfilled all its obligations to the Fund. Monies deposited with the Fund may be considered part of the liquidity of the members.

(I) Liquidation. The Board of Directors may, in its sole discretion, determine to liquidate the fund in whole or in part. In such event, each member shall receive its share of the Fund, after deduction of any indebtedness due.

(J) Any member or members of the Fund proposing to consolidate with one or more other associations to form a new consolidated association or to merge into another such association shall notify the Fund of such action and the liquidated association shall be authorized to transfer its capital note to the surviving association. The surviving association shall purchase such additional capital notes as may be required to maintain its ½% or its 1½% of assets outstanding after the merger. In the event of an increase or decrease in the assets of the surviving member, the adjustments shall be made as of August 31st of each and every year.

(K) Any member having given notice of its intention to withdraw from membership and requesting payment of its capital notes, in accordance with the provision of Section 3–901(B)(6) shall be entitled to receive the face amount of the capital notes within six months after notice of its intention to withdraw; in the event the Central Reserve Fund does not have sufficient cash available to pay the withdrawing member the full amount of the capital note, then, in that event the Fund may make partial payments of

funds received from maturing securities to the withdrawing member until the full amount due the member is paid. Any such deferred payments shall continue to bear interest as though the member were still an active participant in the Fund.