610 A.2d 760

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Robert Brian GREENWALT.**

**Misc. (Subtitle BV) No. 20, Sept. Term, 1990.**

Court of Appeals of Maryland.

Aug. 20, 1992.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel, for Atty. Grievance Comm'n, for petitioner.

Robert Brian Greenwalt, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Respondent, Robert Brian Greenwalt (Greenwalt), obtained a new client, Ridgeway Savings & Loan Association (Ridgeway), when Greenwalt's existing client, David L. Rouen (Rouen), acquired practical control over the affairs of Ridgeway. There followed the now familiar insider loans and other violations of Maryland law that formed the pattern revealed during the Maryland savings and loan crisis of 1985.[1] Eventually Ridgeway was placed in conservatorship. The present charges against Greenwalt grow out of information brought to the attention of Bar Counsel by the Special Counsel on the Savings and Loan Crisis.[2]

The principal issue before us is Greenwalt's exception to every finding that he "[e]ngage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation," in violation of DR 1–102(A)(4) of the former Maryland Code of Professional Responsibility that was in effect during the relevant period.

The background facts are these. Greenwalt was admitted to the Bar of this Court in June 1978. He began practicing law out of offices shared with W. Walter Farnandis, Esq. (Farnandis). Farnandis had founded Ridgeway, a

---

1. For a brief history of the crisis see *Chevy Chase Savings & Loan, Inc. v. State,* 306 Md. 384, 392–97, 509 A.2d 670, 674–77 (1986).

2. The Office of Special Counsel was created under the Acts of 1985, First Special Session, Chapter 11. *See also* W. Preston, *Report of the Special Counsel on the Savings and Loan Crisis* (Jan. 1986).

mutual association, that had offices in Catonsville and in Ellicott City. Farnandis controlled Ridgeway through proxies obtained when passbook accounts were opened, and he served as Ridgeway's legal counsel.

Greenwalt began representing Rouen in 1982. In September 1984 Rouen purchased from Farnandis an assignment of the proxies executed to Farnandis by Ridgeway depositors. The agreement evidencing the terms and conditions of this sale was prepared for Rouen by Greenwalt.[3] Thereafter, a new five person board of directors for Ridgeway was installed. New directors included Rouen, Glen E. Dawson (Dawson), and Charles Oglebay (Oglebay). A carry-over member to the new board was Rosemary Tyler (Tyler), who also continued as secretary of the corporation. Greenwalt was not initially a member of the Rouen-installed board, but became a director in December 1984. Greenwalt, however, was elected president and became counsel of Ridgeway in September 1984 at a combined salary and retainer of $1,500 per month. He continued his law practice and estimates that fees on Ridgeway matters (apparently including loan closings) were twenty-five percent of his income, while legal work for Rouen exclusively was fifteen percent of his time. Under the new board Ridgeway was converted from a mutual to a capital stock association, and stock was issued.

The business philosophy of the new board was described by Greenwalt as follows:

> "[T]he idea of the board, certainly as characterized by Dawson, Oglebay and Rouen, was to make a great deal of money for Ridgeway. That's what they wanted to do. They wanted to get loans at the highest paying interest.
>
> . . . .
>
> Essentially what it meant was that they weren't interested in doing small mortgages on houses. They wanted to go after the big stuff like shopping center loans."

---

**3.** We intimate no opinion on the validity or propriety of this transaction, which is not a basis of any charges in the instant action.

When the Maryland savings and loan crisis struck in May 1985, Ridgeway was able to survive for a number of months by borrowing from Maryland Deposit Insurance Fund (MDIF). Greenwalt resigned as president of Ridgeway in September 1985. Ridgeway was placed in conservatorship on December 13, 1985.

The subject professional disciplinary charges against Greenwalt involve his relationship as attorney to his client, Ridgeway. The charges against Greenwalt were referred for hearing to Judge Joseph F. Murphy, Jr. of the Circuit Court for Baltimore County. Bar Counsel's case at that hearing consisted of documentary exhibits, excerpts from the deposition testimony of Greenwalt taken in a civil damage action brought by MDIF and arising out of Ridgeway's affairs,[4] Greenwalt's testimony at his inquiry panel hearing, and admissions, both in response to requests propounded under Maryland Rule 2–424 and by way of answer to the allegations of the Petition for Disciplinary Action.

Bar Counsel charged that Greenwalt violated numerous disciplinary rules, including DR 6–101, a failure to act competently, and DR 1–102(A)(4), fraudulent conduct. In his report to us Judge Murphy found that certain conduct is, *inter alia*, a violation of DR 1–102(A)(4), but he did not find any violation of DR 6–101. These conclusions thereby embody concerns which Judge Murphy expressed at the hearing when giving Greenwalt an opportunity to explain his conduct. Speaking to Greenwalt, Judge Murphy said:

"They have charged you with fraudulent conduct. Now, I agree, if somebody gets on the witness stand and he says the light was green and it turns out the light was red, that doesn't necessarily mean he committed perjury, but if he knew damn well that he has lied about the color of the light, then he has committed perjury.

"I mean, at some point sloppiness isn't sloppiness necessar[il]y anymore; it is deceit. They have alleged that you have been deceitful in important respects.

---

4. We were advised at oral argument that this civil action was settled.

"Now, I'm trying to get your explanation. I want you to give me your explanation, if you have one, but this business about, geez, I never even thought of it doesn't make any sense to me. It just doesn't."

In his report Judge Murphy distinguished between motive and intent. He found that Greenwalt's violations were willful and deliberate, but that Greenwalt's motive was not "personal greed or other evil motive." It is that finding of intentional fraud to which Greenwalt has filed an across-the-board exception.

Other exceptions by Greenwalt focus on specific conduct. Exceptions by Bar Counsel aver a failure to find additional violations.

### 1. The Shopping Center Loans

In December 1984 the Ridgeway board approved loans totalling approximately $2.3 million to partnerships in which Rouen was a partner and which were developing shopping centers. One project was Town Center in Port Richey, Florida, and the other was Castle Mall (also called University Mall) in Newark, Delaware. The loans were prohibited transactions under Md.Code (1980), § 9–307, "Conflict of Interest," of the Financial Institutions Article, unless excepted under § 9–307(b)(2). For that exception to apply the loan would have to have been approved by the Director of the Division of Savings and Loan Associations (DS & L), then the state regulatory agency. Greenwalt made no effort to obtain DS & L approval for the loans. At his deposition Greenwalt did not recall being concerned with any regulations in connection with these transactions, save the limit on ratio of loan to net worth, discussed *infra.*

In December 1984 Ridgeway had cash of $300,000 to $500,000. It was necessary for Ridgeway to borrow the money to fund the shopping center loans. Ridgeway secured its borrowing by mortgages in its portfolio at a ratio of 1.5 to 1.

The Castle Mall loan closed in December 1984 in Philadelphia. It was secured by a second lien, although the Ridge-

way directors' minutes of December 19, 1984, approved the loan as a first mortgage. Greenwalt attended the closing and learned of the junior position, but did nothing. New York counsel for the buyers-borrowers, who also apparently prepared the loan documents, told Greenwalt that that was the way the transaction had to be structured, because the sellers were getting a take-back first mortgage.

There is no approval of the Port Richey loan in the minutes of Ridgeway's board of directors. Greenwalt says that Dawson signed the loan commitment without authority. The loan closed in Florida with Ridgeway again obtaining a second mortgage. Greenwalt did not attend the closing, apparently relying on Rouen to represent Ridgeway's interest.

Greenwalt relied on counsel for the borrowers to record the second mortgage to Ridgeway on the Delaware transactions, and quite possibly on the Florida transaction as well. In May 1985, during a financial examination of Ridgeway, the examiners told Greenwalt that the mortgage or mortgages were not recorded, but, when Greenwalt inquired, the borrowers' counsel told him that they were recorded. Greenwalt never investigated further.[5]

Against this background Judge Murphy found that the failure to disclose the shopping center loans to DS & L violated, *inter alia*, DR 1–102(A)(4).

In early January 1985 Greenwalt and other Ridgeway board members met with officials of DS & L and of Maryland–Savings Share Insurance Corporation, then the private insurer of accounts of Maryland chartered savings and loan associations, including Ridgeway. In the course of that meeting DS & L learned of the shopping center loans. These loans also violated Code of Maryland Regulations (COMAR), Title 9, § .05.01.30(B)(1) prohibiting any one loan in excess of 100% of net worth. *See* 7 Md.Reg. 56, 57 (Jan.

---

5. The implication from the record before us is that the recordings were accomplished in May 1985.

11, 1980). By letter of January 25 DS & L instructed Ridgeway to obtain participating lenders. Greenwalt replied for Ridgeway by letter of January 29, 1985, stating in part:

> "In regard to the loan in excess of net worth, we have restructured the loan to have the four individuals in the partnership become individually liable for one-fourth of the loan severally, while retaining the partnership as liable for all of the loan."

The loan had not been restructured. Under the loan documents, the members of the borrower partnership did not have personal liability. The loan was not thereafter restructured in order to obtain that personal liability.

Judge Murphy found that Greenwalt took no steps to prevent either of the shopping center loans because he was representing Rouen individually, as well as Ridgeway. Judge Murphy found that Greenwalt's role in these real estate transactions violated, *inter alia,* DR 1–102(A)(4).

### 2. Conversion to Stock

Rouen desired to convert Ridgeway into a capital stock association. Conversions of mutual savings and loans into stock associations were then regulated by DS & L, per a revision of COMAR, Title 9, § .05.01.21, effective January 25, 1980. 7 Md.Reg. 113. The general scheme of the regulation required that a subscription offering be made to eligible accountholders, and the regulation optionally allowed a plan of conversion to permit officers, directors, and employees of a converting association to purchase up to twenty-five percent of the total offering. § .05.01.21B(2)(e) and (3)(a). Under the regulation a plan of conversion was required to provide that any shares not sold in the subscription offering be sold "in whatever manner is satisfactory to the Director." § .05.01.21B(2)(h). Greenwalt prepared a plan of conversion which was approved by DS & L, and the stock was issued in February 1985.

Ridgeway advised DS & L in April 1985 that four accountholders had purchased a total of 175 shares, and that

the remaining shares were held as follows: 8,125 shares by Rouen; 7,020 shares by Nancy Rouen, Rouen's wife; 8,125 shares by Greenwalt; and 8,125 shares by Tyler. Underlying the titling in the names of Greenwalt and Tyler of 16,250 shares on the books of Ridgeway were transactions in the form of loans. Rouen loaned Greenwalt and Tyler approximately $80,000 each with which to purchase stock. That stock secured repayment of the loans which were due in forty-five days. Greenwalt never made any payments against the "loan." Tyler was not a witness.

At the hearing on the charges Judge Murphy asked Greenwalt: "Your interest in the stock was just to hold it in your name so Rouen could control it, right?" Greenwalt replied: "Well, yes. I guess to a large extent, yeah."

Judge Murphy found that Greenwalt "concealed the important fact that the stock issued to himself and to Tyler was actually owned by Rouen," and he found that that concealment violated, *inter alia*, DR 1–102(A)(4).

In May 1985 Ridgeway was seeking insurance from the Federal Savings and Loan Insurance Corporation (FSLIC). In connection with that application Greenwalt was required to complete a questionnaire. He reported under oath that he held $80,000 worth of Ridgeway stock. Judge Murphy found that to be a false representation which violated, *inter alia*, DR 1–102(A)(4).

### 3. Documentation of Loans to Car Dealer

Dating back to the Farnandis era, Ridgeway had invested in loans to one or more automobile sales businesses in which Frank Fair (Fair) was a principal. Fair's business expanded to locations in Columbia and in Lanham. In December 1984 Ridgeway's directors authorized a line of credit for each of these locations in the amount of $100,000 for the purchase of inventory. In February 1985 those lines of credit were respectively increased to $150,000. During the examination of Ridgeway to determine eligibility for federal insurance, the examiners found no documentation

supporting these loans. Bar Counsel alleged in the petition in this action, and Greenwalt admitted, that

> "[t]he examiners questioned [Greenwalt] about the security for the loans to the Frank Fair dealerships and, as a result of said inquiries, [Greenwalt] created and back-dated to January, 1985, security agreements and financing statements and had said documents executed by Frank Fair."

Greenwalt denied the further allegation that he did not disclose the back-dating to the examiners. Greenwalt's position is that the examiners were aware of the true facts. No examiners testified.

The two security agreements at issue are in evidence. On their faces they appear to be contemporaneous with the recited date of the agreements of January 3, 1985. The writings do not recite that, although executed in May, the provisions were retroactive to January. Bar Counsel's point is not that there was a misrepresentation to Fair, or to Ridgeway, but that it was to the examiners for the purpose of concealing Ridgeway's rather informal business practices. The financing statements are actually undated. They were not recorded until December 1985, after the conservatorship was imposed.

In his deposition, taken April 21, 1987, Greenwalt testified that he did not inform the examiners that he had created the documents in May, but that he "simply submitted these documents to them." He said that the examiners had asked for the Frank Fair documents and that he "then created these documents and had Mr. Fair sign them, and I signed them, and presented them to the examiners."

Further, by May of 1985, Fair had exceeded the lines of credit authorized by the Ridgeway board for the Lanham and Columbia locations which owed Ridgeway a total of nearly $330,000. Accordingly, Greenwalt included recitals in the security agreements that the line of credit was $165,000 for each location.

When questioned by Judge Murphy as to precisely what Greenwalt had told the examiners, Greenwalt replied:

"I don't recall what I told them. When they said you have to have the security interest documents, go get them, I said 'Okay, I'll get them.' "

Judge Murphy found that Greenwalt "provided these documents to the examiners without disclosing that the documents had been created recently and back-dated to January." Judge Murphy found that "[t]hese misrepresentations" violated, *inter alia*, DR 1–102(A)(4).

### 4. The Seagers' Transaction

The Ridgeway board, on April 17, 1985, approved a $250,-000 loan to Raymond H. Seager and Catherine C. Seager (the Seagers), secured by "their second mortgage." One hundred thousand dollars was to be advanced at settlement, and $150,000 was to be placed in a five-year certificate of deposit at Ridgeway. Greenwalt prepared, and witnessed at the closing of the transaction, a separate assignment by the Seagers to Rouen of the $150,000 certificate. Greenwalt knew that Rouen was paying $120,000 for the $150,000 certificate of deposit. The certificate of deposit was subsequently changed to a two year term, but Greenwalt testified that he did not authorize that change and that he does not know who did.

Former § 9–307(c) of the Financial Institutions Article prohibited an association's director from buying "at less than face value any interest in a savings account issued by the association." Judge Murphy found that Greenwalt "took no steps to prevent that transaction," and that Greenwalt's role violated, *inter alia*, DR 1–102(A)(4).

The known facts are consistent with the possibility that Rouen was receiving a kick-back for causing Ridgeway to make this second mortgage loan. The known facts are also consistent with the possibility that the Seagers were paying a bona-fide pre-existing indebtedness to Rouen out of the proceeds of a loan which any independent lender would have made. Fully to understand the transaction requires

an economic analysis of its fairness that would be extremely difficult to reconstruct. Prohibitions of the type illustrated by former § 9–307(c) are designed to avoid these problems of proof in uncovering fraud by flatly prohibiting various conflicts of interest. Here the proof is clear that Greenwalt knowingly participated in violating the conflicts prohibition. That prohibition was designed to protect his client from fraud. Against the pattern of the other transactions reviewed above, the violation of § 9–307(c) in the Seagers' transaction is a violation of DR 1–102(A)(4).

### 5. Misrepresentation to DS & L

In June and July 1985 there was an increase in number and intensity of the meetings and correspondence between Ridgeway, MDIF, and DS & L concerning Ridgeway's problems, including the shopping center loans. With respect to the Delaware loan Greenwalt advised MDIF and DS & L in a letter of June 20, 1985, that Ridgeway had "sought a participant, but unsuccessfully." He said that the mortgagors had agreed to obtain a participant for $800,000 of the loan within ninety days. The regulators, meanwhile, had given Ridgeway until July 20 to take corrective action on the problems, including the shopping center loans.

A letter of July 26 to DS & L from Ridgeway reviewed the status of the areas of concern. This letter is signed in Greenwalt's name, but apparently by Rouen, with Greenwalt's authority. Greenwalt testified that he reviewed the proposed letter and knew its contents. With respect to the shopping center loans this letter states:

> "We have begun syndicating these loans and are also checking refinancing the total amount. Total resolution on or before September 30, 1985 (see attached)." [6]

Ridgeway had not begun syndicating these loans. In light of Greenwalt's prior statements in the June 20 letter, a fact finder was not required to view the representation in the July 26 letter as a mere statement of intent, or that

---

**6.** The referenced attachment is not attached to the exhibit in evidence.

efforts were being made to seek participants. A fact finder could interpret the representation to be that some concrete progress had been made, and that at least partial participation had been arranged.

Greenwalt says that the representation was honest. He admits that he had no personal knowledge of any on-going syndication, but says that Rouen told him that "the syndication was occurring." After the hearing, Greenwalt attempted to supplement the record on this point by presenting what is, in form, an affidavit by Rouen. The affidavit was prepared in typewritten form, but was modified in longhand by the affiant. As prepared, the affidavit speaks of syndication efforts referred to in a letter of December 6, 1985, which the affidavit recites as attached, but which is not attached to the affidavit filed in court. As prepared, the affidavit states that those efforts in December "had proceeded since July, 1985." As modified in longhand, the affiant, presumably Rouen, denies personal knowledge of syndication efforts and refers to representations made by Oglebay to Rouen as the source of Rouen's information on syndication. Judge Murphy did not sign any order admitting the content of the affidavit as evidence in the hearing. He was entitled, however, when evaluating the total factual picture, to consider Greenwalt's effort to supplement the record in this fashion.

### 6. Bar Counsel's Exceptions

Based in part on Greenwalt's deposition testimony in the MDIF litigation, the petition for disciplinary action in this matter alleged that Greenwalt conducted approximately fifteen real estate settlements between September 1984 and December 1985 in which he failed to place monies relating to the settlements in a separate escrow account and that he commingled the funds in an account used for his personal or business purposes. In his answer, Greenwalt admitted those allegations. The admitted conduct is a violation of former DR 9–102 and of Md.Code (1957, 1987 Repl.Vol.), Art. 10, former § 44. Judge Murphy did not specifically

address these allegations in his report but concluded generally that all other allegations, not found as violations, had not been proven. Greenwalt's admission, however, is not contradicted or controverted.

Greenwalt also admitted petition allegations that Ridgeway loaned him $59,000 for the purchase of a condominium in Ocean City. The loan represented 100% of the actual purchase price, although Greenwalt testified that Ridgeway was furnished an appraisal valuing the property at more than the purchase price. The transaction violated former § 9–307 of the Financial Institutions Article prohibiting conflicts of interest. This aspect of Greenwalt's admission is neither contradicted nor controverted, but Judge Murphy did not find any violation of the Code of Professional Responsibility. We hold that the conduct is prejudicial to the administration of justice and adversely reflects on Greenwalt's fitness to practice law, in violation of former DR 1–102(A)(5) and (6).

### 7. Summary and Sanction

Greenwalt's exceptions to the report are overruled. Bar Counsel's exceptions are sustained, to the extent indicated above.

We view Greenwalt's violations, particularly of DR 1–102(A)(4), as extremely serious. Members of the public had entrusted their funds to Greenwalt's client, while Greenwalt was assisting insiders in the illegal use of those funds, by failing to comply with laws designed to protect the depositors and by making misrepresentations to regulators. Although Greenwalt did not have extensive experience in practice, at the time of the violations he was also representing, in addition to Ridgeway, a small building and loan association in Baltimore City, and he occasionally had done legal work for two other savings and loan associations. Further, his preparation of the plan of conversion for Ridgeway to a stock association evidences legal sophistication on his part.

Bar Counsel recommends that Greenwalt be suspended for a period of three years. That is an appropriate sanction.

Robert Brian Greenwalt shall stand suspended from the practice of law in this State for a period of three years beginning thirty days from the date of the filing of this opinion. He shall stand suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ROBERT BRIAN GREENWALT.